Turley, J.
delivered the opinion of the court.
This is a ease which has been productive of much feeling and solicitude, and has excited that deep attention and consideration with the public, the bar, and the court, which its magnitude, involving as it does, some of the most vital principles of our social relations, has well merited. It has been thoroughly investigated and ably ai-gued, both on the part of the State and prisoner, and the opinion to which the court has arrived, has been the result of its maturest examination and deliberation, prompted on the one hand, by a deep anxiety to preserve the peace and harmony of society, and on the other, by the fixed determination, resulting from a high sense of duty, to extend to the unfortunate individual under trial, the fullest protection which the law of the State guarantees to him. He is a slave. Slavery exists in Tennessee, having been handed down to us from generation to generation, for centuries. It is secured, protected and regulated by law. With the abstract justice of the institution, we have nothing to do; our duties being confined *514 exclusively to declaring the law, upon questions of controversy arising out of the relations it creates. In the case now under consideration, the slave has deprived his master of his life, and it is for us to pronounce, what atonement, the law, under the circumstances, demands at his hands. It appears from the proof, that the prisoner struck the fatal blow with a butcher-knife, while his master was in the act of attempting to chastise him for disobedience of orders, neglect of duty, and saucy impertinent language. The case shows great forbearance on the part of the master, an entire absence of any ^inhumanity or cruelty, and nothing but a determined design, to inflict such punishment, in proper moderation, as the offence merited, and as was necessary, for the due subordination, regulation, and control of his slave. The blow was struck with a deadly weapon, with a fixed and deadly design, without justification, excuse or mitigation, unless the mitigation is to be found in the assault and battery inflicted upon his person, in the attempted chastisement. It has been argued, that it is; that the statute of 1819, ch. 35, which makes murder, when committed by a slave a capital offence, does not define the offence; that its definition is to be sought in the common law of Great Britain; that there being no slavery in that country, the relation of master and slave, has no existence; that therefore, there is 'no distinction taken between a homicide committed by a slave and a free person, and' of consequence, that in as much as a blow stricken, will in the case of a free person mitigate the offence to manslaughter, the same result must follow in the case of a slave. This is the whole argument, and upon it the case rests.
The common law has been aptly called the “lex non scripta,” because it is a rule prescribed by the common consent and agreement of the community, as one applicable to its different relations, and capable of preserving the peace, good order and harmony of society, and rendering unto every one, that which of right belongs to him. Its sources are to be found in the usages, habits, manners and customs of a people. Its seat in the breast of the judges who are its expositors and expounders. Every nation must of necessity have its common law, let it be called by what name it may, and it will be simple or complicat *515 ed in its details, as society is simple or complicated in its relations. A few plain and practical rules will do for a wandering horde of savages, but they must and will be much more extensively ramified when civilization has polished, and commerce, and arts and agriculture enriched a nation. The common law of a country will, therefore-,■ never be entirely stationary, but will be modified, and extended by analogy construction and custom, so as to embrace new relations, springing up from time to time, from an amelioration or change of society. The present common law of England is as dissimilar from that of Edward the 3d, as is the present state of society. And we apprehend that no one could be found to contend that hundreds of principles, which have in more modern times, been examined, argued and determined by the judges, are not principles of the common • law, because not found in the books of that period. They are held to be great and immutable principles, which have slumbered in their repositories, because the occasion which called for their exposition, had not arisen. The common law, then, is not like the statute law, fixed, and immutable but by positive enactment, except where a principle has been adjudged as the rule of action.
If then, one generation be not so hedged in by the principles of the common law, established by another, as to be prohibited from extending them by analogy and construction, to newrela-tions "and modifications of society, by what principle shall a sovereign State, which has adopted the common law of another, as one of its rules of action, be so prohibited? It will be perceived, that we are approaching the examination of the question, presented for consideration in this case, upon the assumed ground, that there is no adjudged principle of the common law of England, regulating the relation of master and slave, (for we lay out of view the old and exploded relation of master and villein, not feeling it necessary to base our argument upon it) and that there is nothing limiting expressly the slave’s right of resistance to his master, beyond what one free man is limited in his resistance of another.
And we ask if this be so, as the common law is at present and was expounded in England at the time we adopted it, if it of *516 necessity follows, that with a creation of the new relation of master and slave, it may not be so extended by analogy and construction as to embrace it, and give security and protection to all rights arising under it as well of life as property, of master and slave? The argument extended would deprive the master of the right of property in his slave. Our system of slavery in its inception is not based upon positive enactment, but upon the common consent of the community to hold Africans as property. It is true its existence has been since recognized by various acts of parliament in relation to the colonies, by various acts of the legislatures of North Carolina and Tennessee} and by our amended constitution, but still, when we come to enquire, what kind of property a man has in his slaves, what are the remedies provided to secure him in its en- ■ joyment, we are forced to the common law for information. From it we learn that it is personal property, that it passes by alienation, descends and is distributed like other personal property, that the same actions are provided for redress of injuries affecting it, an action of trespass or case for wrongs done it, and trover, or detinue for its conversion or detention. But on what principle do we call it personal property, or bring these actions? By analogy. It is. of the nature of personal proper-perty, as described by the common law, and as such, these are the proper actions for molestation in its enjoyment.
Such then is the common law, that though principles once established by judicial determination can only be changed by legislative enactment; yet such is its malleability (if we may use the expression) that new principles may be developed, and old ones extended by analogy, so as to embrace newly created relations and changes produced by time and circumstances. Such it is, in Great Britain at the present moment; such it was when we adopted it, and such it now is with us. Let us then proceed with these views in hand, to examine what the common law is, in relation to the offence with which the prisoner stands charged and convicted.
Homicide is declared to be either justifiable, excusable or felonious; it is not in the present case pretended to be either *517 justifiable or excusable; it is therefore felonious, and either murder or manslaughter.
Murder is “where a person of sound memory and discretion, unlawfully killeth any reasonable creature in being, with malice aforethought express or implied,” 3d Inst. 47. Manslaughter is “the unlawful and felonious killing of another without any malice express or implied,” as where upon a sudden quarrel, two persons fight, and one of them kills the other, or where a man greatly provokes another by some personal violence, and the other immediately kills him. An assault is in general such provocation, as that if the party struck, strikes again, and death ensues, it is only manslaughter; yet it is not every trivial assault, which will furnish such a justification; for if a man kill another suddenly, without any, or,without any considerable provocation, the law implies malice, and the homicide is murder; but; if the provocation were great, and such as must have greatly provoked him, the killing is manslaughter only. Kel. 135: 1st Hale, 466: Fost. 290.
In considering, however, whether the killing upon provocation amount to murder or manslaughter, the instrument with which the homicide was effected must also be taken into consideration, for if it were effected with a deadly weapon, the provocation must be great indeed, to extenuate the offence to manslaughter; if with a weapon, or other means not likely, or intended to produce death, a less degree of provocation will be sufficient; in fact the mode of resentment must bear a reasonable proportion to the provocation to reduce the offence to manslaughter. Archbold’s Crim. Law, 392. Again, as evidence of provocation is only an answer to that presumption of malice, which the law infers in every case of homicide, if there be proof of malice at the time of the act committed, the additional circumstance of provocation, will not extenuate the of-fence to manslaughter. In such cases, not even previous blows or struggling will reduce the offence to manslaughter. 1st Russell, 440; Mason’s case, Foster, 132: 1st East, P. C. 239: Roscoe Crim. Evidence, 627. In the case of the King vs. Thomas, 7 C. and P. 817 Lord Tenterden observes: “It is not every slight provocation, even by a blow, which will, when *518 the party receiving it, strikes with a deadly weapon, reduce the offence, from murder to manslaughter; that if there had been any evidence of an old grudge between them, the crime would probably be murder.” So tender is the law of human blood, that it watches with a jealous eye, whilst it is making provisions for the weakness and imperfections common to our nature, lest advantage be taken of its mercy, and vengeance be perpetrated under the garb of frailty.
The present case was one of no sudden outbreak; the controversy had been pending for several days; a previous attempt had been made to chastise the prisoner, by the deceased, which was resisted and resented; information had been given on several occasions that the punishment would be inflicted, and enquiry made if he were ready and willing to -receive it; but he obstinately stood out against it; he did more, he prepared himself in the interim, coolly and deliberately with a deadly weapon, with which to resist, and resist unto death, if it became necessary to protect himself from personal chastisement. He did resist, and with a remorseless disregard of consequences, struck the blow which instantly destroyed his kind and indulgent master.
Who shall say, that there was not in this more of vengeance, than sudden heat and passion? If there was, it is murder by the ' common law, as above expounded, though the controversy had been between freemen and equals. But this exposition of the law upon the subject of murder and manslaughter as between equals, is based upon the ground that the -personal violence resented, is a wrong inflicted; but are there no cases adjudged by the common law, where the personal violence cannot be resisted, because it is legally inflicted, and if it be, and death ensues, the person perpetrating it, is guilty of murder or manslaughter, according to the circumstances and the nature of the weapon used? Assuredly there are. A master may correct in moderation his apprentice, a schoolmaster his scholar, a guardian his ward, a parent his child, an officer may arrest and imprison offenders, he may inflict legal punishment upon criminals. In all these cases, the personal injury inflicted, if it exceed not the bounds of moderation, is lawful corree *519 tion, and if the person upon whom itis inflicted, resist and slay, he is guilty of murder and not of manslaughter, for the law cannot admit of the provocation.
The péace, the harmony, the good order and well being of society, require in the existence of these relations, that such should be the right of power and command on the one part, and duty and submission on the other.
If the right of resistance were warranted in such cases, as it is between freemen and equals, the foundations of society would be broken up, and in the place of obedience and submission to the laws, the land would be filled with violence and bloodshed.
The common law then has made provision for resistance, where resistance is lawful, but has prohibited it in all these relations, where the infliction of punishment, as a lawful correction, is necessary for the proper organization and due discipline of society.
If slavery were introduced into England, can it be a matter of doubt, that the common law would at once expand, so as to embrace the relation of master and slave, as it had already done those of a kindred character, master and apprentice, schoolmaster and scholar, parent and child, officer and prisoner? None, as we think whatever. Why may this not be done in this State? Why it may not, no satisfactory reason has been or can be given.
Assuming the position, then, that the common- law as it exists in the State of Tennessee, is of sufficient scope and power, to regard the institution of slavery, to preserve the harmony of its relations, to protect the master and slave in the mutual enjoyment of the rights secured to them, Jet us proceed to examine what those rights are in relation to the subject under investigation.
Unconditional submission is the duty of a slave; unlimited power is, in general, the legal right of the master; but unquestionably there are exceptions to this rule. It is certain, that the master has not the right to slay his slave, or inflict upon him what the law calls great bodily harm, to wit, maiming or dismembering him, or such punishment as puts his life in great and "useless peril, and that the slave has a right to defend him *520 self against such unlawful attempts on the part of the master. But the right to obedience and submission, in all lawful things on the part of the slave, is perfect in the master; and the power to inflict any punishment, not affecting life or limb, which he may consider necessary for the purpose of keeping him in such submission, and enforcing such obedience to his commands, is secured to him by law, and if in the exercise of it, with or without cause, the slave resist and slay him, it is murder, and not manslaughter; because the law cannot recognize the violence of the master as a legitimate cau.se of provocation. Such we hold to be the law. This is, we believe, the first case in which the courts of .this State have been called upon for an application of this principle, but it has been adjudged in other places, to which we may refer, for light and instruction,' as We do upon all other principles of the common law, of doubtful or difficult application.
In the case of The State vs. Will. 1 Dev. & Bat. N. C. Rep. 121, Judge Gaston, (than whom, no man is higher authority,) in delivering the opinion of the court, says: “had the prisoner resisted an arrest, (previously to the shooting,) and in the course of the struggle inflicted the mortal wound on the deceased, there is no doubt his crime in legal contemplation, would have been murder; nothing had then occurred, which could have excited in any but a cruel and wicked heart, in a heart fatally resolved on illegal resistance, at whatever risk of death or great bodily harm, a passion so violent and destructive in its consequences. It is not to passion as such, that the law is benignant, but to passion springing from human infirmity.” The principle thus announced, is directly applicable to the present case. The prisoner did resistan arrest;'there had been no attempt on the part of his master to endanger his life and. he did kill him in this his illegal resistance, and the conclusion follows, that he is guilty of murder.
In the case of The State vs. Jarratt, 1st Iredell’s N. C. Rep. 76, it is held, “that the same matters, which would be deemed in law, a sufficient provocation to a free white man, who has committed a homicide in a moment of passion, from the guilt of murder, will not have the same effect, where the party slain is *521 a white man, and the offender a slave. The rule, that where parties become suddenly heated and engage in mortal conflict, fighting upon equal terms, and one kills the other, the homicide is mitigated to manslaughter, applies only to equals and not to the cáse of a white man and a slave, if the slave kill the white man under such circumstances. And an ordinary assault and battery committed by a white man upon a slavé, will not be a sufficient provocation, to mitigate a homicide of the former by the latter, from murder to manslaughter.”
These authorities meet our approbation; they are supported by reason and necessity, and we think expound the law correctly, and are decisive of the present case.
We might here, if it were deemed necessary, enter into a more minute examination of the relation of master and slave, with a view to the extraction of principles, which might be made applicable to cases not like the present, arising out of it hereafter, but we do not think it expedient or proper. If cases arise, presenting shades of difference from the present, it will then be time enough to examine them; this blow has been struck, it is all that has now to be expiated; and “sufficient for the day is the evil thereof.”
Some criticisms have been made at the bar upon the charge of the judge below; but we think it substantially correct. It is true he might have been more explicit, upon the distinction between murder and manslaughter, and if from the facts of the cáse, there had been any pretence for holding the killing to be manslaughter, he should have been. But there is none, and a charge upon the subject, /would have been a charge upon an abstract principle, having nothing to do with the facts of the case.
It will be observed, that the question made as to murder or manslaughter, does not arise out of a controversy about facts, but about the application of a principle of law, and upon the settlement of the principle, the question is settled, so that no good 'could have resulted to the prisoner from more minuteness oni khe part of the judge. The judgment of the court below is therefore affirmed.
*522 GREEN, J.
delivered the following opinion.
I think proper to announce distinctly, as my opinion, that there may exist cases, in which the lolling of a master, by his slave, would be manslaughter. What circumstances of torture', short of endangering life or limb, would so reduce a homicide, it is not easy to indicate. Every such case must rest upon its own peculiar facts. The rights and duties of the parties must form the mima by which an enlightened court and jury should act.
But the present case is destitute of a single mitigating circumstance, and is most clearly one of murder.