Sandra WALKER, bnf Homer Walker, Petitioner-Respondent,

v.

Theodore E. HAMBY and Tennessee Farmers Mutual Insurance Company, Respondents-Petitioners.

Homer WALKER, Petitioner-Respondent,

v.

Theodore E. HAMBY and Tennessee Farmers Mutual Insurance Company, Respondents-Petitioners.

Supreme Court of Tennessee.

Dec. 3, 1973.

Jack R. Brown, Chattanooga, for Sandra Walker and Homer Walker.

Paul Campbell, Jr., Chattanooga, for Tennessee Farmers Mutual Ins. Co.

Russell Bean, Chattanooga, for Theodore Hamby.

## OPINION

FONES, Justice.

Sandra Walker, a minor fifteen years of age, and her father, Homer Walker, were plaintiffs, and Theodore Hamby and Tennessee Farmers Mutual Insurance Company were defendants in the trial court. The parties will be referred to by name, or by their status in the trial court.

Sandra Walker sued for personal injuries sustained when she was thrown from a "dune buggy", being driven by Hamby. Her father's derivative suit was for medical expenses and loss of services. A jury verdict for $25,000 in Sandra's case, and $5,000 in her father's case, was approved by the trial judge, and defendants appealed. The Court of Appeals reversed and remanded for a new trial, finding errors in the charge of the trial court.

We granted the petitions of plaintiffs and defendants for the writ of certiorari,

and the case has been ably and fully briefed and argued.

There is little or no dispute as to the material, determinative facts. Ronnie Gann, for the purchase price of $20.00, was the owner of what he designated a "dune buggy". It had a motor, a frame, four wheels and tires, and two bucket seats. The driver's seat had a safety belt, the passenger seat did not. There was a piece of wood on the back part of the frame. It had a steering wheel, accelerator, foot brake, two forward gears, and one reverse. It had no body, doors, sides, windshield, headlights, bumpers, fenders, or top. It did not have an emergency brake. It was not titled, registered, licensed, and could not be insured. Ronnie Gann used it for riding about his father's farm, and did not use it on the public roads, or rather, apparently had not used it on public roads prior to the week-end of the tragedy. One of Sandra Walker's brothers was married to Ronnie Gann's sister. On Saturday, the day before the accident, Gann's dune buggy was towed from his home in Hixson, Tennessee, to the Walker residence on Hixson Pike in Soddy, Hamilton County.

Wayne Walker, aged 25, Ronnie Walker, aged 20, Sandra's brothers, and Ronnie Gann, drove the dune buggy on Saturday. The plaintiff Homer Walker, head of the household, observed the vehicle and testified as follows, on cross-examination:

"Q. All right, sir. Now, when you saw it on Saturday afternoon you recommended that they put handrails or something to hold for the passengers—for the passengers to hold onto it, did you not?

A. That's right, I said something to that youngest boy of mine. I said, Ronnie you need something there. That's right, I did.

Q. You told him he needed something there to—

A. To hold on.

Q. So the passenger could hold onto and to hold them in place, didn't you?

A. That's right.

Q. But Ronnie didn't put any side rails on it, did he?

A. Didn't out there in my presence.

Q. Yes, sir, and the reason that you mentioned putting these side rails on it was because you considered it dangerous to ride in without it, did you not, sir?

A. Well, yeah, I thought a fellow might fall off one riding outside.

Q. Yes, sir.

A. What would a man make a remark like that for if he didn't?"

On Sunday, defendant Hamby, who had been dating Barbara Walker for approximately one year, came to the Walker home after church. Homer Walker knew that his sons, daughters, Hamby and Gann were planning to tow the dune buggy over to Clift Mill Road, where they could ride it. He issued no precautionary instructions on Sunday. In the afternoon, they left the Walker residence on Hixson Pike, in an undesignated number of vehicles, and drove to Clift Mill Road. The dune buggy was towed there, according to Gann. There was a light rain or mist. Clift Mill Road had either a red clay dirt surface or dirt with some gravel packed in. It appears that from the gathering point on Clift Mill Road, various combinations of the group would take an excursion down Clift Mill Road and return. At least two excursions preceded the one that ended in tragedy. Sandra was seated in the passenger bucket seat, on the outside, sharing it with Barbara, who was between her and Hamby, the driver. Sandra was thrown out of the dune buggy and sustained a skull fracture.

Barbara Walker's description of the accident is as follows:

"Q. Where were you riding in the car?

A. The middle.

Q. And where was your little sister riding?

A. The right side of me.

Q. And Mr. Hamby driving?

A. Yes.

Q. Now, would you tell us what happened as he drove along before the accident happened?

A. Well, it had started misting rain, and the three of us had got in it, and he started to take off, and he started giving it the gas and let up, and he did that about three times and it started fish-tailing?

Q. What do you mean fish-tailing?

A. The backend started going to the side, I guess what you call it is fish-tailing?

Q. Yes. What happened then?

A. Well, he lost control of it and it went up a bank and he started to try, he cut it to avoid hitting a tree, and my sister fell out and he went up the bank and went off the road, and went headon into a bank.

Q. What happened to you?

A. When he came off the bank, I was thrown over the front of it in the middle of the road.

Q. Where did your sister end up?

A. On the bank."

The foregoing testimony of Barbara Walker is the only evidence in the record on behalf of the plaintiffs as to how this accident occurred.

Defendant Hamby testified as follows:

"Q. I see. Now, Ted, on this first trip that you took down the road how fast in your estimation did this vehicle go?

A. Approximately forty to forty-five miles an hour, somewhere in there.

Q. And who was driving at that time?

A. I believe Ronnie was, Ronnie Walker.

Q. Did the vehicle slide at any time on this trip?

A. In curves it did career a little bit. It didn't never actually get sideways. It just had a little hair fishtail to it.

Q. Did Sandra or anyone in the vehicle ever ask to slow down or anything of that nature?

A. There was not, to my knowledge. We were just doing a lot of whooping and hollering and that was about it.

Q. Now, who went on the second trip when you got back?

A. To the best of my knowledge, it was Ronnie Gann, Wayne Walker and Ronnie Walker.

Q. Now, when they came back who went on the third trip?

A. Myself as the driver and Barbara and Sandra Walker.

Q. All right, did you ask to drive this vehicle?

A. Barbara Walker asked me to drive it.

Q. How far had you gone down this road before this accident happened?

A. Approximately three-quarters of a mile, something like this.

Q. About how fast were you going?

A. In the neighborhood of forty-five to fifty, somewhere in there. It's just hard to say.

Q. Just tell the Court—I mean tell the jury what happened then in regard to the accident?

A. There's a photo that might show to a certain extent what this actual

accident scene looked like but there was just a hair of an incline and I would say somewhere in the neighborhood of fifty yards, something like this, the car going straight. Wasn't no obvious curve, just that it was going straight and it just seemed like underneath the conditions it just started careening and I applied the brake and the officer which looked at the scene did see where I applied the brake, wrote it down in his report that I did.

MR. BROWN: I object to what the officer said.

Q. Don't tell what the officer said.

THE COURT: Sustained.

Q. Go ahead. Describe the accident.

A. Okay, there was a bank. I don't know how much of a ditch there was before the bank—the ditch went down and then there was a bank of some angle like this and there was a tree. I don't know if the vehicle came in contact with the tree but the vehicle did go up on the bank, turn and go to the other side and stop. And Sandra was thrown out. Barbara was also thrown out. Whether she was thrown out through the front—I know that she was in the middle of the road when I stopped. I just looked back and she had fallen out of the car. There was nothing for us to hold on to. The only reason I didn't fall out was because of the steering column.

Q. Ted, how far back from where this accident happened did this vehicle start this fishtailing?

A. Approximately fifty yards I reckon. Something like this.

Q. In your opinion, did you in any way cause it to start fishtailing?

A. I—there had—to the best of my knowledge, I did none of what I would call acceleration and deceleration, to the best of my knowledge. It was a constant speed once I got there and I never did attempt to slow down until I noticed that the accident was or at least the accident —the vehicle did start doing this sliding motion."

Defendants insist that the trial court should have sustained their motions for directed verdicts, on the ground that plaintiffs were guilty of contributory negligence and assumption of the risk, as a matter of law.

The distinction between contributory negligence and assumption of the risk is often difficult in automobile tort cases. Assumption of the risk is less frequently applicable than contributory negligence, because said doctrine requires consciousness and appreciation of the danger and voluntary exposure thereto.

■■■ First, we agree with the Court of Appeals that this record shows Sandra Walker, aged fifteen, to be an honor student in high school, with no known physical or mental defects. She is therefore charged, as a matter of law, with the same degree of care as an adult, there being no evidence whatever to submit to the jury in rebuttal of the prima facie presumption that a minor over fourteen is capable of the same degree of care as an adult. Parenthetically, we observe that, in the area of consciousness of danger, her father, Homer Walker, testified unequivocally that he recognized and was conscious of the danger involved in riding as a passenger on Gann's dune buggy. That a directed verdict should have been granted in his case is obvious, and requires no further comment.

Also, we are in accord with the following statement of the Court of Appeals: "It is undisputed that the purpose of driving and riding on the contrivance was for the fun, thrill and excitement of the experience, and not for any other purpose or objective."

Barbara Walker did not testify as to the speed at which Hamby was driving the dune buggy, nor the speed at which it was being driven on any prior trips. Thus, in the following respects, the testimony of defendant Hamby is undisputed: (1) on a prior trip where the dune buggy obtained a speed of from 45 to 50 miles an hour, it fishtailed, and he, Sandra, and Barbara Walker were passengers on the rear of the vehicle when it did so; (2) Hamby was driving the dune buggy at a speed of 45 to 50 miles per hour when it fishtailed and he lost control. There is no evidence that any factor other than fishtailing caused Hamby's loss of control of the dune buggy. The dune buggy did not strike anything and Hamby was not injured. He had a steering wheel to hold onto, which was the only thing in the vehicle to assist in preventing a person from being thrown therefrom. Sandra's injury was the result of the fact that she was riding on an open vehicle, with nothing to hold onto. This was the exact peril most apparent from even a cursory view of the dune buggy. How can the absence of doors, body, or any device to hold onto or restrain a passenger in or on a 4-wheel apparatus with a motor and frame be said to escape the consciousness of anyone who sets eyes upon it? How can anyone who contemplates riding on such a contraption be said to be oblivious to the peril inherent therein? Homer Walker saw and expressed his consciousness of the danger.

 The operation of the laws of motion are such that all persons of normal intelligence are charged with the knowledge that our bodies go backward, forward, and swing to the side, as an automobile starts, stops and turns. It is simply beyond dispute that it was inherently dangerous to ride as a passenger on the Gann dune buggy, assuming normal vehicular operation. A person who voluntarily submits to a ride on such a contraption for the fun, thrill and excitement of the experience, must be held, as a matter of law, to have consciously and unreasonably exposed himself to a risk or a known danger. As this Court said in Lea v. Gentry, 167 Tenn. 664, 73 S.W.2d 170 (1934), ". . . when there can be no dispute as to his consciousness of the peril inherent in such a situation, then a question of law only remains, and the question is one for the Court."

 Thus, we are compelled to hold that Sandra Walker assumed the risk of the injury she sustained when she voluntarily submitted to the ride which she took on the dune buggy.

With this view of the case, it becomes unnecessary for us to discuss plaintiffs' assignments of error or any of the numerous additional assignments of error on the part of defendants. To do so would be mere dictum. It results that the judgments of the trial court and the Court of Appeals are reversed and the plaintiffs' suits are dismissed, at their costs.

DYER, C. J., and McCANLESS, J., JENKINS and LEECH, Special Judges, concur.