Wilma **CARDWELL** and Robert Cardwell, Individually and as Mother and Father and Next Friend of Sandra K. Cardwell, and Sandra K. Cardwell, Individually, Plaintiffs-Appellees,

v.

Dr. E.L. **BECHTOL,**
Defendant-Appellant.

Supreme Court of Tennessee,
at Knoxville.

Feb. 9, 1987.

John H. Hogin, Margaret G. Klein, Knoxville, for defendant-appellant.

Kenneth E. Hall, T. Harold Pinkley, Knoxville, for plaintiffs-appellees.

OPINION

DROWOTA, Justice.

An issue of first impression in Tennessee is raised in this appeal as to whether Tennessee should adopt a mature minor exception to the common law rule that requires a physician to obtain parental consent before treating a minor. This case arose out of treatment administered by Defendant, Dr. E.L. Bechtol, to Sandra K. Cardwell, the daugther of Robert and Wilma Cardwell. Defendant is a doctor of osteopathy. At the time of treatment, Sandra Cardwell was a minor. The suit was instituted by the Plaintiffs, Sandra Cardwell, individually, and by her parents, both individually and as next friends on behalf of their daughter.

While Sandra Cardwell (Ms. Cardwell) was attending high school, she had suffered from persistent but intermittent back pain. She first saw her family physician in the summer of 1981 for this problem. Subsequently, in early October, 1981, she went to the Knoxville Orthopedic Clinic where she was seen by Dr. Stevens. His preliminary diagnosis was that she was displaying symptoms associated with a herniated disc; he recommended that she be hospitalized for further tests and therapy. Her parents decided to obtain a second opinion before acceding to hospitalization and she went to see Dr. McMahon, an orthopedic specialist, in Oak Ridge on October 15, 1981; he concurred in the diagnosis and recommendation of Dr. Stevens.

On November 9, 1981, she was hospitalized at St. Mary's Medical Center in Knoxville. She was attended by Doctors Stevens and Wallace and underwent conservative treatment consisting primarily of physical therapy and injections. A recommended myelogram was rejected by her parents. A conservative course of treatment was continued following her discharge from the hospital on November 16, 1981. Dr. Sidney Wallace assumed treatment of Ms. Cardwell; he saw her several more times during the remainder of 1981 and in the early months of 1982. Apparently, both Ms. Cardwell and her parents hoped to avoid any necessity to resort to surgery.

Although her condition did not bother her continuously and she was usually able to participate in her normal high school activities, she was not obtaining any significant relief for her pain, despite the therapy and treatment she received under Dr. Wallace's care. In March, 1982, Dr. Wallace again recommended pre-surgical, diagnostic testing to identify definitely the nature of the problem, but Ms. Cardwell and her parents evidently continued to resist consideration of surgery. On April 26, 1982, having taken her mother's car to school, Ms. Cardwell left school early and went to see the family physician for treatment of a sore throat. With her mother's permission, she went to the family doctor's office alone. After her appointment with this doctor, she spontaneously decided that she would go to see Defendant, an osteopath who had treated her father's back condition on several occasions in the past. She had not told her parents that she was going to see Defendant but decided to do so on this day because her back was hurting her.

Defendant is a licensed osteopath but because he has been blind for most of his life, he limits his practice to manipulative treatments to adjust or realign the skeletal system. He conducts his sole practice with the assistance of his wife and daughter, who maintain his records. He was alone in his office when Ms. Cardwell came to see him. She told Defendant her name and that her father had been one of his patients; she also informed him of her symptoms and of the diagnoses of the orthepedic specialists she had seen. Defendant concluded, after examining her briefly, that a herniated disc was not her problem and treated her with manipulations involving

her neck, spine, and legs for subluxation of the spine and bilateral sacroiliac slip. The treatment lasted for about 15 minutes, after which he asked her to return several times during the next few weeks for further manipulations. Ms. Cardwell wrote her name, age, and address down on a card Defendant supplied for this purpose and then paid his fee of $25.00 with one of her father's blank, signed checks, which had been given to her to be used when she needed money.

After Ms. Cardwell left Defendant's office, she began to experience a tingling and numbing sensation in her legs. She drove to her aunt's house and lay down to take a nap. She was awakened by severe pain about an hour later. The pain was such that she had difficulty walking, but having driven her mother's car, she was obligated to pick her up from work. She found she had difficulty driving and when she reached her mother's place of employment, her pain had become very intense. By the time she and her mother arrived at home, she was no longer able to walk by herself. Later in the evening, she was driven to the emergency room at St. Mary's Medical Center in Knoxville and was subsequently admitted. Over the course of the evening, she also developed urinary retention problems and had to be catheterized.

During the next few days, she underwent diagnostic testing, which confirmed that she had a herniated disc, and a laminectomy was performed on April 29, 1982. Although no visible nerve damage was apparent, she continued to experience bladder and bowel retention and had continued difficulty walking as well as decreased sensation in her legs and buttocks. Her condition has improved gradually since her surgery, but she had not yet regained normal bowel control or complete sensation in her buttocks and one of her legs at the time of trial.

This action was filed on April 22, 1983, in Anderson County Circuit Court. The initial complaint alleged only medical malpractice (in the diagnosis and treatment of Ms. Cardwell's condition) but the complaint was subsequently amended to include counts of battery (failure to obtain parental consent), negligent failure to obtain consent, and failure to obtain informed consent. The case was tried from September 25 to 27, 1984. At the close of the Plaintiffs' evidence, Defendant's Motion for a Directed Verdict on the medical malpractice issue was granted by the trial court because Plaintiffs had failed to carry their burden of proof under T.C.A. § 29–26–115, which requires that a plaintiff in a medical malpractice suit produce expert testimony on the local standard of care of a physician in a practice or specialty relevant to the treatment performed by the defendant. The remaining issues of battery and informed consent were submitted to the jury; the jury instructions included the mature minor exception to the requirement of parental consent to perform medical treatment on a minor. A general verdict was returned for Defendant.

On appeal, the Eastern Section affirmed the trial court's directed verdict on the malpractice count, holding that Plaintiffs' expert witness, an orthopedic surgeon, was not qualified by his own admission to testify regarding the standard of care of an osteopath in this situation, and thus the trial court did not abuse its discretion in disqualifying his testimony. Nevertheless, the Court of Appeals reversed on the issue of battery because neither the Tennessee Legislature nor the Tennessee Supreme Court had adopted the mature minor exception to the established common law rule that a physician cannot treat minors without parental consent. Having directed a verdict on its finding of a technical battery, the intermediate court determined that it had no choice but to reverse and remand the case for a new trial solely on the issue of damages.

A timely Application for Permission to Appeal was filed by the Defendant and was granted by this Court. We now reverse the Court of Appeals on the issue of battery and reinstate the judgment of the trial court. The issues presented on appeal concern the capacity of a mature minor to give informed consent to medical treatment under the mature minor exception and the requirements of expert testimony under

the Medical Malpractice Statute, T.C.A. §§ 29–26–115 and 29–26–118.

## I. *The Mature Minor Exception*

### A.

On April 26, 1982, the date of Ms. Cardwell's treatment by Defendant, she was 17 years, 7 months of age, a senior in high school with good grades, and was planning to attend college. She had been licensed to drive since she was 16 years old. As a routine practice from the time she was 14 years old, she had permission to use her father's checking account; she carried several signed, blank checks in lieu of cash and had been very responsible in the exercise of this privilege. Testimony consistently characterized Ms. Cardwell as a mature young woman who acted somewhat older than her age. Her parents permitted her substantial discretion because of her demonstrated maturity.

On the day she went to see Defendant, she had taken her mother's car so that she could go by herself to see the family physician about a sore throat. She had left school early and with her parents' permission had gone to this doctor's office alone, where she was examined and treated by the family doctor, who had not personally obtained parental consent. She decided to see Defendant on her own initiative because she knew her father had been to see him and she thought that Defendant might be able to provide some relief for her back pain. She had not told her parents that she was going to see Defendant and apparently had not been encouraged to do so by her parents. Although she did not know exactly what manipulative therapy involved, she was generally aware of the kind of practice an osteopath had. She also testified that Defendant did not treat her against her will.

Defendant testified that Ms. Cardwell seemed to him to be a mature young woman. While generally minors are accompanied by adults when they come to him for treatment, and parental consent is ordinarily obtained for treatment, Ms. Cardwell's demeanor led him to think that she was of age and that she had come to him because he had previously treated her father. He did not believe it was necessary to inquire about parental consent in this case.

### B.

Plaintiffs argue that no effective consent was obtained by Defendant either from Ms. Cardwell herself or from her parents, actually or impliedly, resulting in a technical battery. Moreover, because no exception to the common law rule has been adopted by the Tennessee Legislature, except in specific statutes that are inapplicable to this case, Plaintiffs contend that the Legislature has implicitly fixed as the immutable law of this State the general common law rule that parental consent is required before a physician can treat a minor. Apparently, Plaintiffs' position is that the development of the common law has been arrested by these narrowly drawn statutory exceptions to the general common law rule embodied in the statutes.

That Tennessee is a common law state is clearly established. *See, e.g., State v. Alley,* 594 S.W.2d 381 (Tenn.1980); *Powell v. Hartford Accident and Indemnity Co.,* 217 Tenn. 503, 398 S.W.2d 727 (1965); *Henley v. State,* 98 Tenn. 665, 41 S.W. 352 (1897). As a general principle, however, judicial development of the common law is not arrested by piece-meal legislative adoption of specific statutory exceptions to a general common law rule.

> " 'If the statute does not include and cover such a case, it leaves the law as it was before its enactment. It is well settled that a statute will not be construed to alter the common law, further than the act expressly declares or than is necessarily implied from the fact that it covers the whole subject-matter.' *State v. Cooper,* 120 Tenn. 549, 553, 113 S.W. 1048, 1049."

*Olsen v. Sharpe,* 191 Tenn. 503, 507, 235 S.W.2d 11, 12 (1950). This Court has consistently recognized that the "rule of reason is one of the bases of the common law and it is also founded on usages, habits and customs and will never be entirely statutory, but will be modified and extended by anology, construction and custom so as to

embrace new relations springing up from time to time to conform with the change and desire of society. *Jacob v. State,* 22 Tenn. 493 (1842)." *Powell v. Hartford Accident and Indemnity Co., supra,* 217 Tenn. at 509–510, 398 S.W.2d at 730. Further,

> "[t]he common law binds courts only less firmly than statutes. Its rules are gradually, almost imperceptibly, enlarged or contracted by the courts, by construction, in the course of their application to new states of fact, to meet the needs of a progressive civilization but it is not allowable to change them per saltum. This can be done only by legislation."

*Northcut v. Church,* 135 Tenn. 541, 556, 188 S.W. 220, 223 (1916). To a great extent, the common law originated in court-fashioned rules, and inherent in the jurisprudence of the common law is the power of courts to develop and adapt the principles of its application.

In other areas, this Court has not failed to continue the evolution of the common law where the subject is not clearly covered by statutory law. *See, e.g., Davis v. Davis,* 657 S.W.2d 753 (Tenn.1983) (Abrogation of the prior common law doctrine of interspousal tort immunity); *Arnold v. Hayslett,* 655 S.W.2d 941 (Tenn.1983) (A minor is capable of contributory fault); *Powell v. Hartford Accident and Indemnity Co., supra* (Same duty of care to be imposed on all persons operating motor vehicles, regardless of age); *Walker v. Hambry,* 503 S.W.2d 118 (Tenn.1973) (Assumption of risk by minor recognized). Where the Legislature has not expressly acted to occupy the area held by the common law, nothing we have discovered in our jurisprudence requires "the closing of doors to changed conditions" as long as "the decisions of the court [are] so fashioned that the new truly grows out of the old as the product of a changed environment." *Powell v. Hartford Accident and Indemnity Co., supra,* 217 Tenn. at 513, 398 S.W.2d at 732. One of the great attributes of Anglo-American common law has been the flexibility demonstrated by the case by case judicial development of the principles and rules of the common law to

adapt to the emerging conditions of society; this flexibility permits the law to remain relevant and reasonable, preventing "mindless obedience to [a] precept [that] can confound the search for truth and foster an attitude of contempt." *Davis v. Davis, supra,* at 758. *Cf. Kilbourne v. Hanzelik,* 648 S.W.2d 932, 934 (Tenn.1983) (" '[W]e abdicate our own function, in a field peculiarly non-statutory, when we refuse to consider an old and unsatisfactory court-made rule.' ") (citation omitted).

### C.

■ While we acknowledge that the Legislature has enacted several statutes concerning medical treatment of minors without parental consent, *see* T.C.A. §§ 39–4–202, 68–34–104, 68–34–107, 63–6–220, 63–6–222, and 63–6–223, these statutes are either a " 'statutory enactment of the common law rule,' " *State v. Alley, supra,* at 382 (citation omitted), in the case of emergency treatment of minors, or are statutes in derogation of the common law and will thus be strictly construed and confined to their express terms. *Austin v. County of Shelby,* 640 S.W.2d 852, 854 (Tenn.App.), *permission to appeal denied* (Tenn.1982). *See also, e.g., Olsen v. Sharpe, supra,* 191 Tenn. at 507, 235 S.W.2d at 12. We find no indication in any of the statutes of any intent on the part of the Legislature to establish a comprehensive statutory scheme to occupy the area of medical treatment of minors in its entirety. On the contrary, these statutes do no more than provide conditional immunities from certain types of liability in specific situations (where such immunities were not otherwise clear in the law) or promote certain social purposes, such as treatment of drug abuse or venereal disease in minors. We do not think that the conclusion that these statutes are intended to abrogate judicial adoption of an exception to the general common law rule requiring parental consent to treat minors can be supported by the express terms of any of these provisions.

Furthermore, recognition that minors achieve varying degrees of maturity and responsibility (capacity) has been part of

the common law for well over a century. *See, e.g., The Queen v. Smith,* 1 Cox C.C. 260 (1845); 42 Am.Jur.2d, Infants, §§ 9, 45, 142. The rule of capacity has sometimes been known as the Rule of Sevens: under the age of seven, no capacity; between seven and fourteen, a rebuttable presumption of no capacity; between fourteen and twenty-one, a rebuttable presumption of capacity. In Tennessee and elsewhere, the rule of capacity of minors has been generally applied in criminal cases. *See, e.g., Colley v. State,* 179 Tenn. 651, 169 S.W.2d 848 (1943); *Juvenile Court of Shelby County v. State ex rel. Humphrey,* 139 Tenn. 549, 201 S.W. 771 (1918). The Rule of Sevens has been applied in the context of torts as well. *See, e.g., Walker v. Hambry, supra; Bailey v. Williams,* 48 Tenn. App. 320, 346 S.W.2d 285 (1960), *cert. denied* (Tenn.1961). The competency of minors to testify as witnesses has also been measured by the common law Rule of Sevens. *See, e.g., State v. Fears,* 659 S.W.2d 370 (Tenn.Crim.App.1983).

In addition, the Legislature has enacted several statutes that are consistent with or merely codify the Rule of Sevens established at common law. Under T.C.A. § 37–1–134(a), a minor may be tried as an adult in criminal cases if the "child was sixteen (16) years or more of age at the time of the alleged conduct, or the child was more than fourteen (14) years of age if such child was charged with [certain violent crimes]." A minor may obtain a driver's license at 16, but may obtain a learner's permit at age 15 or a special restricted license between the ages of 14 and 16; however a chauffeur's license may not be given to anyone under 18. *See* T.C.A. §§ 55–7–104 and 55–7–105. These statutes clearly recognize the varying degrees of responsibility and maturity of minors 14 years and older.

T.C.A. §§ 1–3–105(1) and 1–3–113(a) now establish the age of majority in this State

as 18 years old, except for the purpose of the purchase of alcoholic beverages. That the Legislature has adopted a lower age for attainment of majority indicates persuasively that conditions in society have changed to the extent that maturity is now reached at earlier stages of growth than at the time that the common law recognized the age of majority at 21 years. The conditions and reasons that made 21 the age of majority have been eroded over time. Moreover, the enactment of statutes establishing specific exceptions to the general common law regarding medical treatment of minors also tends to show that the attitudes and customs of society concerning the relative maturity of minors have changed. In any case, these statutory exceptions for medical treatment of minors without parental consent can apply whether the minor is 17 years, eight years, or one year old, although as a practical matter many such statutes will not usually be invoked except in cases of older minors. The mature minor exception, however, is limited by the application of the Rule of Sevens and is an exception to the general rule that parental consent is required to treat minors.[1]

### D.

■ Adoption of the mature minor exception to the common law rule is by no means a general license to treat minors without parental consent and its application is dependent on the facts of each case. It must be seen in the context of the tort in question. At this point in the analysis, the issue is whether Ms. Cardwell had the capacity to consent to the treatment administered by Defendant.[2] If Ms. Cardwell had the capacity to consent, then her informed consent would be effective to negate any battery committed by Defendant in the course of his treatment of her. The Second Restatement of Torts, § 892, states:

---

1. T.C.A. § 34–1–101 provides that parents are the natural guardians of their minor children, charged with their care, nurture, welfare, education, and support.

2. For the purposes of this opinion, the related question of whether her consent was not effective, not because she lacked capacity but because she was not sufficiently informed, is considered as a separate issue, which is discussed below.

(1) Consent is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor.

(2) If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact.

■ Plaintiffs contend that Ms. Cardwell failed to consent, even if she had the capacity to do so. A person may, however, consent by conduct. By presenting herself to Defendant for examination and treatment and then by submitting to treatment without protest or resistance, Defendant could reasonably conclude that he had Ms. Cardwell's consent to the treatment. "[C]onsent is regarded as present, also, when one manifests a willingness that the defendant engage in conduct and the defendant acts in response to such a manifestation." Prosser and Keeton, *Torts* (5th edition, West 1984), § 18, p. 113. From Ms. Cardwell's conduct in Defendant's office and by her own testimony, the jury could conclude that she had consented to the treatment. Thus, her capacity to give effective consent is determinative. If she had this capacity, the issue of whether parental consent, implied or actual, was given is pretermitted.

■ The trial court instructed the jury on the general rule that parental consent, whether implied or actual, is required to treat a minor; the mature minor exception was also included by the trial court and had been specifically requested by the Defendant; it was stated by the trial court as follows:

"One exception to the [general] rule has been recognized when the child is close to majority or maturity and knowingly gives an informed consent to the treatment. In this case, it is for you to determine whether the child in question was of sufficient maturity and judgment to give actual consent."

The Second Restatement of Torts, § 892A, comment b, discusses the exception regarding mature minors:

"To be effective, the consent must be given by one who has the capacity to give it or by a person empowered to consent for him. If the person consenting is a child or one of deficient mental capacity, the consent may still be effective if he is capable of appreciating the nature, extent and probable consequences of the conduct consented to, although the consent of a parent, guardian or other person responsible is not obtained or is expressly refused."

Additionally, Prosser and Keeton include a discussion of the relative capacity of a minor to consent, stating that "[a] minor acquires capacity to consent to different kinds of invasions and conduct at different stages in his development. Capacity exists when the minor has the ability of the average person to understand and weigh the risks and benefits." Prosser and Keeton, *supra*, § 18, at 115.[3]

Although no Tennessee case has previously dealt directly with this issue, courts in other states have adopted this exception to the general rule.[4] In *Younts v. St. Francis Hospital and School of Nursing, Inc.*, 205 Kan. 292, 469 P.2d 330 (1970), the parents of a 17 year old minor brought suit on theories of malpractice and battery when their daughter was treated without their consent by defendant's hospital staff. The daughter's finger had been injured in an accident that occurred in her mother's hospital room while she was attending her mother following surgery; her mother was semi-conscious after surgery, was unable to give consent, and her father was unavailable to give consent to treatment of the daughter's injury. The Kansas Supreme Court stated the general rule:

---

**3.** Effectiveness of consent can be attacked on two grounds in this situation: (1) lack of capacity to understand the risks and benefits of the treatment, or (2) lack of information to which to apply the capacity to understand such risks and benefits. The second assumes the first is present; the first precludes consideration of the second by definition.

**4.** For an early example of the application of this exception, *See Gulf & S.I.R.Co. v. Sullivan*, 155 Miss. 1, 119 So. 501 (1928).

"It is the settled general rule that in the absence of an emergency or unanticipated conditions arising during surgery a physician or surgeon before treating or operating must obtain the consent of the patient, or if the patient is incompetent the consent must be obtained from someone legally authorized to give it for him. A surgical operation on the body of a person is a technical battery or trespass, regardless of its result, unless the person or some authorized person consents to it. Generally, the surgeon is liable for damages if the operation is unauthorized."

469 P.2d at 336 (citations omitted).

The Court observed that in this case the minor "was seventeen years old, intelligent and capable for her age.... The [treatment] ... was of a minor nature. The plaintiff remained conscious throughout the treatment and was fully aware of what was being done. She raised no objection to the ... procedure." 469 P.2d at 333. As an issue of first impression in Kansas, the Court recognized the mature minor exception as one of several exceptions regarding treatment of minors:

"[G]enerally the consent of a parent to a surgical operation on a child is necessary. Certain exceptions are recognized ... (1) whether an emergency exists, (2) when the child has been emancipated, (3) when the parents are so remote as to make it impracticable to obtain consent in time to accomplish proper results and (4) when the child is close to maturity and knowingly gives an informed consent."

469 P.2d at 337 (citation omitted). Nevertheless, "the sufficiency of a minor's consent depends upon his ability to understand and comprehend the nature of the surgical procedure, the risks involved and the probability of attaining the desired results in the light of the circumstances which attend." *Id.*

While the age of majority was still 21 years in Ohio, another case arose involving treatment of a minor of 18. A plurality opinion was issued *per curiam*, but two concurring opinions accompanied the opinion of the Ohio Supreme Court. *Lacey v.*

*Laird*, 166 Ohio St. 12, 139 N.E.2d 25 (1956) (*per curiam*). The concurring opinion of Justice Hart succinctly expresses the policy that underlies the general common law rule:

"The general rule seems to be that, unless there exists an emergency, which prevents any delay, or other exceptional circumstances, a surgeon who performs an operation upon a minor without the consent of his parents or guardian is guilty of a trespass and battery. This rule is not based upon the capacity of a minor to consent, so far as he is personally concerned, within the field of the law of torts or law of crimes, but is based upon the right of parents whose liability for support and maintenance of their child may be greatly increased by an unfavorable result from the operational procedures upon the part of the surgeon."

139 N.E.2d at 30.

In the concurring opinion of Justice Taft, the Rule of Sevens was stated, 139 N.E.2d at 33, and, recognizing that various stages of maturity are reached prior to attainment of majority, he then asked rhetorically about the logic of applying the strict common law rule to every case: "[D]oes any boy who kisses a girl under 21 with her consent but without the consent of her parents thereby expose himself to an action for assault and battery; and does every high school football player run the risk of assault and battery actions by boys under 21 with or against whom he plays?" *Id.*, at 34.

Despite the lack of any cases directly on point in this State, Tennessee cases involving torts in which minors are either the tortfeasors or the victims of torts are relevant to determining whether the policy of this State compels the application of the strict view of the general common law rule regardless of the maturity of the minor or the circumstances and nature of the treatment involved. Consonant with the Rule of Sevens, the standards to which minors are held vary with the relative ability of the minor to appreciate his own conduct and the consequences of the conduct of others.

Thus in *Arnold v. Hayslett, supra*, whether a minor would be capable of contributory fault is a question of fact in which "the fault of minors is to be judged by a standard somewhat different from that applicable to adults, and ... the age, experience, training, education and maturity of the child must be taken into account." 655 S.W.2d at 947. *See also Standridge v. Godsey*, 189 Tenn. 522, 533, 226 S.W.2d 277, 282 (1949). Similarly, in *Prater v. Burns*, 525 S.W.2d 846 (Tenn.App.), *cert. denied* (Tenn.1975), a child's capacity for negligence was relevant to whether the parents could be held liable for negligent entrustment of a firearm to a minor; the Court of Appeals held that "the proof of the minor's acts, demeanor and conduct at the time of the injury to another is material evidence on the minor's experience, training and judgment in the use of the firearm, and is therefore admissible on the issue of the parents' negligence in permitting the minor to use the weapon." *Id.*, at 850. The Court of Appeals also applied the Rule of Sevens. *Id.*, at 852. In *Cartwright v. Graves*, 182 Tenn. 114, 184 S.W.2d 373 (1944), a school bus driver was found liable for negligence when he failed to warn or restrain a six year old child alighting from the bus that a truck was approaching at such a rate of speed that the child could not safely cross the street. The Court emphasized that six years old was "a wholly irresponsible age," 182 Tenn. at 124, 184 S.W.2d at 377, at which the child was unable to understand or foresee the danger, and found that consideration of the age of the child, the child's experience and ability were appropriate in determining the degree of care required of persons who have charge of children. *Id.*

Cases in this State have consistently considered the relative maturity and ability of a minor to appreciate his own conduct's consequences and the consequences of the conduct of others in assessing the extent of responsibility to which a child will be held. *Walker v. Hambry, supra*, recognized that a minor may be charged with assumption of the risk.[5] In that case, the record showed that the minor

> "aged fifteen, [was] an honor student in high school, with no known physical or mental defects. She is therefore charged, as a matter of law, with the same degree of care as an adult, there being no evidence whatever to submit to the jury in rebuttal of the prima facie presumption that a minor over fourteen is capable of the same degree of care as an adult."

565 S.W.2d at 122. In contrast, *Bailey v. Williams, supra*, involved an injury to an eight year old playmate by a seven year old, and the Court of Appeals, recognizing the presumptions of the Rule of Sevens, stated that "[t]he rule with respect to a minor's capacity for negligence is that the question is to be judged in the light of his age, ability, intelligence, training and experience and the complexity of the danger with which he is confronted." 48 Tenn. App. at 324, 346 S.W.2d at 287. As previously noted, in criminal cases, the Rule of Sevens has been applied to the capacity of a minor to commit a crime; essentially, this has now been codified at T.C.A. § 37–1–134. *See, e.g., Colley v. State, supra; Juvenile Court of Shelby County v. State ex rel. Humphrey, supra*.

■ Several relevant principles from these cases may be stated for this case. Whether a minor has the capacity to consent to medical treatment depends upon the age, ability, experience, education, training, and degree of maturity or judgment obtained by the minor, as well as upon the conduct and demeanor of the minor at the time of the incident involved. Moreover, the totality of the circumstances, the nature of the treatment and its risks or probable consequences, and the minor's ability to appreciate the risks and consequences are to be considered. Guided by the presumptions in the Rule of Sevens, these are questions of fact for the jury to decide.

■ In our opinion, adoption of the mature minor exception to the general common law rule at issue would be wholly

---

**5.** Justice Taft in *Lacey v. Laird, supra*, compared capacity to consent to medical treatment to the ability of a minor to assume the risk. 139 N.E.2d at 32.

consistent with the existing statutory and tort law in this State as part of "the normal course of the growth and development of the law." *Powell v. Hartford Accident and Indemnity Co., supra,* 217 Tenn. at 513, 398 S.W.2d at 732. Accordingly, we hold that the mature minor exception is part of the common law of Tennessee. Its application is a question of fact for the jury to determine whether the minor has the capacity to consent to and appreciate the nature, the risks, and the consequences of the medical treatment involved. In the circumstances of this case, and based on the evidence presented at trial, we think that the jury was justified in concluding that Ms. Cardwell had the ability, maturity, experience, education and judgment at her 17 years, 7 months of age to consent knowingly to medical treatment. "In this case, therefore, the reason for the common law rule does not exist. Where the reason fails the rule should not apply." *Brown v. Selby,* 206 Tenn. 71, 78, 332 S.W.2d 166, 169 (1960).

We do not, however, alter the general rule requiring parental consent for the medical treatment of minors. We observe here that under the Rule of Sevens, it would rarely, if ever, be reasonable, absent an applicable statutory exception, for a physician to treat a minor under seven years, and that between the ages of seven and fourteen, the rebuttable presumption is that a minor would not have the capacity to consent; moreover, while between the ages of fourteen and eighteen, a presumption of capacity does arise, that presumption may be rebutted by evidence of incapacity, thereby exposing a physician or care provider to an action for battery.

## II. *Informed Consent*

A complete analysis of the issue of the effectiveness of consent cannot be made without considering whether Ms. Cardwell had sufficient information concerning the risks and consequences of the treatment administered, regardless of her capacity to give actual consent under the mature minor exception. Whether the information she had was sufficient depends on the nature of the treatment, the extent of the risks involved, and the standard of care of the treating physician. The burden of proof on the issue of standard of care is controlled by T.C.A. § 29–26–118 of the Medical Malpractice Act.

### A.

Ms. Cardwell testified that she was not fully cognizant of the nature of spinal manipulative therapy, that she had never undergone such treatment, and that she had never discussed it in any detail with anyone, including Defendant, as of April 26, 1982. She did have a general idea of what the practice of an osteopath involved, considering it similar to that of a chiropractor. She knew that manipulations were involved and that this treatment was the reason she decided to see Defendant. She stated that Defendant did not discuss the nature of the treatment or tell her of any risks, although she did seek Defendant's treatment and manifestly consented to the manipulations. She did tell Defendant the diagnoses of the orthopedic specialists who had previously seen her.

Dr. Michael Eisenstadt, a neurologist, testified as an expert for Plaintiffs. He stated that he was familiar with the standard of care required to obtain informed consent and that older children have a greater capacity to comprehend the nature of the treatment. He was of the opinion that the effectiveness of consent depends on the risks involved in the proposed treatment. He admitted, however, that he was not familiar with the standard of care for an osteopath in informing a patient as to the risks of manipulative treatments.

For Defendant, Dr. James Carson, an osteopath, testified as an expert on the standard of care of osteopaths in informing patients of the attendant risks of manipulative treatment and regarding the standard of care in administering such treatment. His opinion was that the effectiveness of consent depends on the treatment and the risks involved. In the case of manipulative treatment, the need to explain is minimal because the treatment is of a minor nature with few risks. He was also

of the opinion that the standard of care of osteopaths and medical doctors were not identical. In addition, Defendant testified in his own behalf. He stated that relatively little risk is usually involved in manipulative therapy. He generally did not find it necessary to explain the risks of manipulations unless the patient expressed concern; Ms. Cardwell did not express any apprehension about the treatment at the time he examined and treated her.

### B.

T.C.A. § 29–26–118 provides that

"the plaintiff shall prove by evidence as required by § 29–26–115(b) that the defendant did not supply appropriate information to the patient in obtaining his informed consent (to the procedure out of which plaintiffs claim allegedly arose) in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the defendant practices in the community in which he practices and in similar communities."

Incorporating the common law controlling the effectiveness of consent, the statute explicitly requires as part of the plaintiff's burden of proof that the standard of care for obtaining informed consent must be shown by expert evidence in the same manner as provided in T.C.A. § 29–26–115(b). As stated in *Baldwin v. Knight*, 569 S.W.2d 450, 453 (Tenn.1978), T.C.A. § 29–26–115(b) "adds ... to the present case law requirements relating to expert testimony, (1) the necessity that a medical expert be licensed in this state or a contiguous bordering state; (2) the relevant specialty requirement; and (3) judicial discretion to waive those requirements upon a showing of the unavailability of such witnesses." Where a person has the capacity to consent, consent may not be effective because the person was not sufficiently aware of the extent of the risks or the nature of the treatment involved.

"Counsel insists that simply because plaintiff testified that no one told her of any possible risks prior to receiving the injection, a *prima facie* case based on lack of informed consent was made out.... [I]n matters of informed consent the plaintiff has the burden of proving by expert medical evidence, (a) what a reasonable medical practitioner of the same or similar communities under the same or similar circumstances would have disclosed to the patient about attendant risks incident to a proposed diagnosis or treatment and (b) that the defendant departed from the norm."

*German v. Nichopoulos*, 577 S.W.2d 197, 204 (Tenn.App.1978), *cert. denied* (Tenn. 1979).

Although this provision is part of the malpractice statute and while determining whether the Defendant failed to obtain informed consent is dependent upon the standard of care of the profession or specialty, if informed consent is not effectively obtained, the defendant's departure from the standard of care is not negligence but battery because "the doctrine of battery [is] applicable to cases involving [treatment] performed *without informed or knowledgeable consent*." *Ray v. Scheibert*, 484 S.W.2d 63, 71 (Tenn.App.), *cert. denied* (Tenn.1972) (emphasis in original). As observed in *Lanford v. York*, 224 Tenn. 503, 457 S.W.2d 525 (1970), malpractice "'is based on lack of care or skill in the performance of services contracted for, and [battery] on wrongful trespass on the person regardless of the skill employed. The assertion of one is the denial of the other.'" 224 Tenn. at 510–511, 457 S.W.2d at 528 (citation omitted).

■ We found it necessary to note this because the Plaintiffs alleged and the trial court instructed the jury on "negligent failure to obtain informed consent." T.C.A. § 29–26–118 does not codify or otherwise create such a cause of action.[6] While the determination of the effectiveness of consent cannot be made without expert testi-

---

**6.** This provision incorporates only subsection (b) of T.C.A. § 29–26–115 and does not impose the negligence requirements of T.C.A. § 29–26– 115(a) on a plaintiff alleging failure to obtain informed consent in a malpractice action.

mony on the standard of care concerning what information is usually supplied to enable a patient to give informed consent, considering both the seriousness of the treatment and any expression of concern by the patient, failure to give such information is not the type of omission that results in negligence, but rather it negates consent for the treatment. Without consent, the treatment constitutes a battery.

■ Under the case law, the correct analysis in our opinion is that if the evidence shows that the person had the capacity to consent, then the question becomes whether the consent given was effective because it was based upon adequate information on which to make the decision to submit to treatment; if not, then a battery results, but if so, then the question becomes whether the defendant subsequently did anything negligent in the administration of the treatment for which consent was obtained, proof of which is controlled by T.C.A. § 29–26–115. The trial court's instruction on negligent failure to obtain informed consent was, therefore, error, but in view of the verdict and our decision in this case, it was harmless error. Rule 36, T.R.A.P.

■ These theories, battery and malpractice, are not ordinarily inconsistent, and no election of remedies is generally required; if a battery exists, then malpractice may not necessarily be reached, but if no battery can be shown, then the issue clearly emerges as one of malpractice. This distinction between battery and malpractice (as a form of negligence) is consistently recognized in the case law. *See, e.g., Ray v. Scheibert, supra; Lanford v. York, supra; Butler v. Molinski,* 198 Tenn. 124, 277 S.W.2d 448 (1955). As the Kansas Supreme Court noted in *Younts v. St. Francis Hospital and School of Nursing, Inc., supra,* "a malpractice claim based upon negligence in the care and treatment of a patient is not concerned with the consent of the patient. The consent of the patient or of his parent is immaterial in such a case because consent does not free the hospital or the doctor from the consequences of negligence."

469 P.2d at 333 (citations omitted). Thus, "whenever a physician performs [treatment] upon a person, not being authorized by consent and not being protected by the exception made in cases of emergency, the physician is liable to such person for consequent injuries, regardless of whether such injuries resulted from negligence or otherwise." *Ray v. Scheibert, supra,* at 71.

### C.

■ In this case, expert testimony was advanced by Plaintiffs regarding the general standard of care of physicians in obtaining informed consent, but this expert was not familiar with the type of treatment administered to Ms. Cardwell. Considering that Ms. Cardwell did not express any concern to Defendant regarding the treatment and in view of the Defendant's testimony and that of his expert that the manipulations involved in this case are usually a relatively minor form of treatment for which little, if any information is needed to obtain effective consent, we think the jury was warranted in concluding that Ms. Cardwell was adequately informed to give effective consent.

Under T.C.A. § 29–26–118, the standard of relevancy is that provided by T.C.A. § 29–26–115(b). A recent case of this Court has construed the standard of relevancy embodied in T.C.A. § 29–26–115(b) as not requiring "that the witness practice in the same specialty as the defendant," *Searle v. Bryant,* 713 S.W.2d 62, 65 (Tenn. 1986), but the witness must demonstrate sufficient familiarity with the standard of care and the testimony must be probative of the issue involved. Dr. Eisenstadt stated he was generally familiar with the standard of care of physicians in obtaining informed consent, testifying that in general the amount of information to be supplied would be a function of the risks of the treatment, but being unfamiliar with the nature of the treatment in this case, his opinion might very well be less persuasive to a jury than that of experts who were both knowledgeable of the standard of care generally (and who agreed with Dr. Eisenstadt regarding this general standard) and

of the nature of the particular treatment administered. As the Supreme Court of Arizona noted in *Fridena v. Evans*, 127 Ariz. 516, 622 P.2d 463, 467 (1980) (citations omitted):

> "Historically, it has been held that a member of one 'school' of medicine is not competent to testify against a member of another school.... This rule has been eroded in a number of ways, and it has been held that where standards of different schools are or should be the same with respect to a particular condition, experts from such schools should be fungible in terms of their competency to testify regarding those specific standards.... Here, there has not been shown to exist any material differences between the two schools that would make any difference...."

T.C.A. § 29–26–115(b) recognizes this fungibility of experts as long as the expert practices in "a profession or specialty which would make his expert testimony relevant to the issues" and the other competency requirements of this provision are met. *See Sutphin v. Platt*, 720 S.W.2d 455 (Tenn.1986); *Searle v. Bryant, supra*. Essentially, aside from its procedural restrictions, T.C.A. § 29–26–118 states the rule, as expressed by the *Younts* court, that, " '[t]he duty of the physician to disclose ... is limited to those disclosures which a reasonable medical practitioner [in the locality] would make under the same or similar circumstances,' " 469 P.2d at 336 (citation omitted), and "what is a reasonable disclosure upon which an informed consent may rest must depend upon the facts and circumstances of each case." 469 P.2d at 337 (citation omitted).

### III. *Medical Malpractice*

The final issue presented for resolution is whether the trial court erred in directing a verdict on the malpractice count because Plaintiffs failed to produce expert testimony on the standard of care required of Defendant in diagnosing Ms. Cardwell's condition and in administering manipulative treatment under the circumstances of this case. This issue is governed by the requirements of T.C.A. § 29–26–115.

### A.

Several experts testified for Plaintiffs regarding causation and the extent of Ms. Cardwell's injuries; two of these offered to testify concerning the standard of care of an osteopath in administering manipulative treatment to a person in Ms. Cardwell's condition. While Dr. Sidney Wallace, an orthopedic specialist, testified that the manipulations (and to some extent a delay from April 26 to the surgery on April 29) exacerbated Ms. Cardwell's pre-existing back condition and precipitated the immediate need to perform surgery (although he also believed surgery would have likely become necessary at some point anyway), the trial court did not permit Dr. Wallace to testify to the standard of care required of an osteopath in the circumstances of this case. By his own admission, Dr. Wallace was not familiar with the practice and types of treatments administered by osteopaths. Dr. Michael Eisenstadt, a neurologist, testified as to the general standard of care in the medical profession regarding obtaining informed consent, and attempted to testify regarding Defendant's standard of care in diagnosing Ms. Cardwell's problem and in administering manipulative treatment, but he also conceded that he was not an osteopath, had no training in the field, and was unfamiliar with the standard of care of that profession. Consequently, neither expert could render a relevant opinion on this issue.

Dr. James Carson and Defendant both testified as experts on the standard of care for osteopaths in performing manipulative treatments on a person in Ms. Cardwell's condition. Dr. Carson expressed the opinion that Defendant's treatment did not cause or exacerbate Ms. Cardwell's condition. He testified that the symptoms of Ms. Cardwell were consistent with the diagnoses both of Defendant and of Ms. Cardwell's orthopedic specialists. As noted previously, he stated that the standards of care of osteopaths and medical doctors were not generally the same. Defendant testified that manipulations are generally considered a conservative treatment and

that from what Ms. Cardwell told him and from his examination he made his diagnosis.

### B.

T.C.A. § 29–26–115 affirmatively places the burden of proof in a malpractice case upon the plaintiff:

"(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

(c) In a malpractice action as described in subsection (a) of this section there shall be no presumption of negligence on the part of the defendant. Provided, however, there shall be a rebuttable presumption that the defendant was negligent where it is shown by the proof that the instrumentality causing injury was in the defendant's (or defendants') exclusive control and that the accident or injury was one which ordinarily doesn't occur in the absence of negligence.

(d) In a malpractice action as described in subsection (a) of this section, the jury shall be instructed that the claimant has the burden of proving, by a preponderance of the evidence, the negligence of the defendant. The jury shall be further instructed that injury alone does not raise a presumption of the defendant's negligence."

Tennessee courts have construed these provisions and their predecessors in a number of cases. *See, e.g., Sutphin v. Platt, supra; Tutton v. Patterson,* 714 S.W.2d 268 (Tenn.1986); *Searle v. Bryant, supra; Baldwin v. Knight, supra; Lanford v. York, supra; Pyle v. Morrison,* 716 S.W.2d 930 (Tenn.App.), *permission to appeal denied* (Tenn.1986); *Stokes v. Leung,* 651 S.W.2d 704 Tenn.App.), *permission to appeal denied* (Tenn.1983); *Dolan v. Cunningham,* 648 S.W.2d 652 (Tenn.App.1982), *permission to appeal denied* (Tenn.1983). *Cf., e.g., Ison v. McFall,* 55 Tenn.App. 326, 400 S.W.2d 243, *cert. denied* (Tenn.1964); *Merryman v. Bunch,* 24 Tenn.App. 408, 145 S.W.2d 559, *cert. denied* (Tenn.1940) (Consistent common law cases with comparable results). T.C.A. § 29–26–115 essentially codifies the common law elements of negligence without substantive modification:

"The plaintiffs have the burden of proving, by expert testimony (1) the standard of care, (2) that defendant deviated from that standard, and (3) that as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries *which would not otherwise have occurred.* See T.C.A. § 29–26–115."

*Dolan v. Cunningham, supra,* at 654 (emphasis in original). *See also Pyle v. Morrison, supra,* at 936. Nevertheless, it does impose more rigorous procedural requirements on the plaintiff in a malpractice action, but, as this Court has previously observed in this regard, "the conclusion is inevitable that the Legislature has sanc-

tioned existing case law governing both substantive and evidentiary requirements, merely adding thereto ... the additional expert witness requirements." *Baldwin v. Knight, supra,* at 453. The requirements found in T.C.A. § 29–26–115(b) make it clear (1) that a modified locality rule is the law of this State, *see Sutphin v. Platt, supra,* and (2) read with T.C.A. §§ 29–26–115(c), (d), that "[t]he mere fact that the professional service rendered was not a success does not in any sense justify the conclusion that the defendant was guilty of actionable negligence." *Butler v. Molinski, supra,* 198 Tenn. at 130, 277 S.W.2d at 451.

### C.

■■■ Under the terms of this statute and the law of evidence generally, the trial court exercises broad discretion to determine the qualifications of experts and its determination will not ordinarily be reversed absent some abuse of discretion. *See, e.g., Pyle v. Morrison, supra,* at 933; *Stokes v. Leung, supra,* at 706. At the close of Plaintiff's evidence, no admissible expert testimony existed on the record relevant to the standard of care in the locality of an osteopath in similar circumstances. The trial court, therefore, committed no error in granting Defendant's Motion for a Directed Verdict on the issue of malpractice. *See, e.g., Sutphin v. Platt, supra; Stokes v. Leung, supra,* at 706–707; *German v. Nichopoulos, supra,* at 202; *Butler v. Molinski, supra,* 198 Tenn. at 128, 277 S.W.2d at 450. *Cf. Dolan v. Cunningham, supra,* at 654 (" [I]f the issue is one upon which expert testimony is necessary, and the non-moving party cannot produce an expert ... summary judgment may be appropriate....").

Plaintiffs argue that the trial court should have exercised its discretion under T.C.A. § 29–26–115(b) to permit their experts to testify under the waiver provision of the statute. They also contend that the standard of care under the Medical Malpractice Act is the same for osteopaths as it is for medical doctors because all of the healing arts are subsumed in the practice of medicine and thus a minimum standard of care regarding matters of common observation and experience in the healing arts can be established by the expert testimony of medical doctors for all professions covered by the Medical Malpractice Act.

Although the standard of care may be established by the defendant's own admissions, *Tutton v. Patterson, supra,* at 270, that is not the case here. Moreover, *Searle v. Bryant, supra,* at 65, held that T.C.A. § 29–26–115(b) "contains no requirement that the witness practice the same specialty as the defendant," but, as previously noted, the witness must be sufficiently familiar with the standard of care of the profession or specialty and be able to give relevant testimony on the issue in question. *Cf. Ison v. McFall, supra.* Without the requisite threshold evidence of the standard of care in the locality, regardless of the other requirements of the statute, Plaintiffs were not able to demonstrate "a breach of duty to the patient to use that degree of skill and learning which is ordinarily used under similar circumstances by members in good standing in his profession." *Merryman v. Bunch, supra,* 24 Tenn.App. at 410–411, 145 S.W.2d at 561 (citations omitted).

■■■ The record does not reflect that Plaintiffs sought to make any timely motion or any showing that a waiver under T.C.A. § 29–26–115(b) would be appropriate. *See, e.g., Pyle v. Morrison, supra,* at 933; *Ayers v. Rutherford Hospital, Inc.,* 689 S.W.2d 155, 161 (Tenn.App.1984) *permission to appeal denied* (Tenn.1985). The trial court's decision to disqualify Plaintiff's experts is, thus, fully supported by the record. Having found no abuse of discretion, we also think that adoption of the Plaintiffs' contentions concerning the general standard of care to which medical doctors could testify is contrary to the express provisions of T.C.A. § 29–26–115(b) and would be a significant departure from the case law of this State. The statute was enacted in part to prevent further erosion of the competency requirements for expert witnesses in malpractice actions. *Cf. Sutphin v. Platt, supra.* The statute and cases currently permit some fungibility of

experts, but where an expert is unfamiliar with the practice of another field and with its standard of care or "where material differences between ... schools," *Fridena v. Evans, supra,* 622 P.2d at 467, have been shown, we do not think it would be consistent with the terms or the policy of the Medical Malpractice Act to permit the kind of generalized evidence as that proposed by Plaintiffs in this case.

> "The trial judge and the court of appeal ruled correctly that the plaintiff had not met her burden of proof as to malpractice. The only evidence as to that standard consisted of the testimony of two orthopedic surgeons. Both of these admitted they had no formal training in the manipulatory techniques of chiropractors and that they were at best familiar with those techniques. This is not sufficient to establish a standard of chiropractic care."

*Boudreaux v. Panger,* 490 So.2d 1083, 1085 (La.1986).

### IV.

Addition of the mature minor exception to the general common law that requires parental consent to treat a minor is consistent with the evolution of the common law of torts in this State and flows as a consequence of those changed conditions that, among other things, have justified the lowering of the age of majority to 18 years of age. We have not found any State policy, legislative or otherwise, that would preclude adoption of the mature minor exception. On the contrary, the statutory law both is generally consistent with the common law on the capacity of minors and supports our conclusion that adoption of this exception undermines no express or apparent legislative policy. Furthermore, this exception is circumscribed by the rebuttable presumptions of the Rule of Sevens and limited by the facts and circumstances of each case; thus, little chance exists that the exception will swallow the rule.

The mature minor exception pretermits the issue of parental consent and we do not address that issue. Ms. Cardwell was only five months short of the age of majority at the time of this incident; the presumption of capacity, therefore, attached under the Rule of Sevens. The jury's verdict, based on instructions incorporating the mature minor exception and the evidence in this case, implicitly found that Ms. Cardwell did have the judgment, ability, education, and training at her 17 years, 7 months to have the capacity to consent and did in fact consent to the Defendant's treatment. The same capacity to consent entails the ability to appreciate and weigh the risks and benefits of the treatment she sought and thus to give informed consent to it. The jury also found that the Defendant complied with the standard of care of his practice in providing her with sufficient information upon which Ms. Cardwell could give informed consent. The treatment was relatively minor, with a minimum risks of injury, and Ms. Cardwell expressed no concern about the treatment at the time it was to be administered. The jury could reasonably have found that Plaintiffs did not show that Defendant had deviated from the standard of care concerning the information ordinarily supplied to obtain informed consent to Defendant's treatment. Consequently, having the capacity to consent and having given informed consent, no battery occurred because Ms. Cardwell's consent was effective on the facts of this case.

Absent any actionable battery, the Plaintiffs' remaining theory was the allegation of medical malpractice. The trial court did not err in directing a verdict on this issue. By their own admissions, both of Plaintiffs' experts were not sufficiently familiar with the standard of care for osteopaths and could thus not offer any probative opinion testimony concerning the Defendant's diagnosis or the administration of manipulative treatments in the circumstances of this case. The trial court did not abuse its discretion in disallowing the testimony of these experts on this record. Absent any relevant expert testimony on the standard of care of Defendant, the Plaintiffs could not carry their burden of proof under T.C.A. § 29–26–115. We decline to adopt a more expansive reading of this statute on

the facts of this case than is already permitted in the case law.

Accordingly, we reverse the Court of Appeals on the issue of battery and reinstate the judgment of the trial court. The Court of Appeals and the trial court are affirmed on the issue of competency of an expert under T.C.A. § 29–26–115. Costs of this appeal are taxed equally to the parties. The case is dismissed.

BROCK, C.J., and FONES, HARBISON and COOPER, JJ., concur.