**Hayden RAY, Jr., Plaintiff-Appellant,**

v.

**Doctor David C. SCHEIBERT, Defendant-Appellee.**

Court of Appeals of Tennessee,
Middle Section.

Feb. 25, 1972.

Certiorari Denied by Supreme Court
Aug. 21, 1972.

Alfred P. Adams, Jr., and Fred E. Cowden, Jr., of Glasgow, Adams & Taylor, Nashville, for plaintiff-appellant.

William J. Harbison, of Trabue, Minick, Sturdivant & Harbison, Nashville, for defendant-appellee.

OPINION

PURYEAR, Judge.

This is a suit for damages arising out of a surgical procedure performed by the defendant, Doctor David C. Scheibert, on the plaintiff, Hayden Ray, on August 11, 1965.

In his declaration plaintiff averred that he was in a good state of health until the latter part of 1964, when he began to notice a tingling and numbness in his lower back and extremities and this caused him to consult the defendant on or about July 22, 1965, as a result of which the defendant performed various tests and the defendant advised surgery for the purpose of relieving pressure on the spinal cord resulting from an arthritic spur which had been discovered in the tests.

It is further averred in the declaration that on August 11, 1965, defendant performed surgery on plaintiff, as a result of which plaintiff suffered paralysis in his upper and lower extremities, and in the urinary tract and the lower intestinal tract; that he was and is permanently injured, for which injuries he sues the defendant for $250,000.00 damages.

The suit was filed on January 15, 1968, which was more than two years after the surgery was performed.

In said declaration plaintiff avers that defendant did not advise him of the risks involved in such surgery and therefore, the plaintiff never effectively consented to it as such because he was not advised of its serious nature, extent and of the attendant dangers therein.

The original declaration contains the following averment:

"Subsequent to the operation, plaintiff avers that Dr. Scheibert concealed from him the true nature of his injury and therefore any cause of action based upon that injury by erroneously informing him during the entire time he was under Dr. Scheibert's care that his difficulties resulted from the contraction with his muscular back." (Tech.Rec. p. 5)

To this original declaration the defendant filed a demurrer in which it is averred that the action is based upon an alleged battery committed upon the plaintiff by defendant because of plaintiff's alleged failure to consent to the operation and on its face the declaration shows that the plaintiff's cause of action is barred by the statute of limitations of one year applicable to suits for personal injuries. (T.C.A. § 28–304).

This demurrer was heard by the trial Court on October 11, 1968, as a result of which hearing the trial Court entered the following order:

"This cause came on to be heard before the Honorable John L. Uhlian, Jr., Circuit Judge, on Friday, October 11, 1968, upon the demurrer of the defendant heretofore filed to the declaration in this cause and upon motion of the plaintiff to dispose of said demurrer. After hearing argument of counsel, the Court is of the opinion that said demurrer is well taken and should be sustained. It is accordingly

ORDERED, ADJUDGED AND DE-CREED by the Court that the demurrer heretofore filed by the defendant be and the same hereby is sustained. The plaintiff will be and he is hereby allowed thirty days within which to amend his declaration, failing which the suit will stand dismissed at the cost of plaintiff." (Tech.Rec. p. 10)

On November 8, 1968, plaintiff filed the following amendment to his declaration:

"The professional relationship between the plaintiff and the defendant continued uninterrupted from July 1965 until February 1967. Following the surgery herein described, plaintiff inquired repeatedly of the defendant as to the cause of his persistent and severe disability, and each time was assured by the defendant that his difficulty was caused by the muscular condition of his back, a condition which the plaintiff believed would correct itself when his muscles became relaxed with reduced activity and the passage of time, and which he believed was not a serious or permanent condition. Plaintiff believes and therefore alleges that the defendant made such representations recklessly without a medical basis for making the same. Such representations were untrue, however the same were relied upon by the plaintiff who did not know them to be untrue and who was unaware of the true nature of his serious injury until after February 1967 when he terminated the professional relationship between himself and the defendant and was admitted to Mayo Clinic in July 1967, as hereinafter described." (Tech.Rec. p. 11)

Thereafter, the defendant filed another demurrer to the declaration as amended also upon the grounds that the declaration showed upon its face that the plaintiff's cause of action was barred by the statute of limitations of one year.

This second demurrer was sustained by the trial Court on February 28, 1969, from which order sustaining said demurrer, plaintiff appealed to the Supreme Court.

The Supreme Court reversed the trial Court's action in sustaining the demurrer to the declaration as amended and remanded the case to the trial Court. Ray v. Scheibert (1969), 224 Tenn. 99, 450 S.W.2d 578.

The defendant then pled the general issue and for further plea relied upon the statute of limitations of one year and denied the allegations of fraudulent concealment.

In its opinion, supra, the Supreme Court quoted certain portions of the declaration as amended and said:

"We are of opinion that the foregoing excerpts from the declaration adequately charge fraudulent concealment. Mr. Justice Chambliss speaking for the Court in Hudson v. Shoulders, 164 Tenn. 70, 45 S.W.2d 1072 (1931), said that in order for the statute of limitations to be tolled by a fraudulent concealment there must be an allegation that the cause of action was known to the defendant and fraudulently concealed by him and that the running of the statute would not be prevented by mere ignorance of the plaintiff and his failure to discover the existence of the cause of action within the statutory limitation would not prevent its running and that if the plaintiff either knew or neglectfully failed to discover the cause of action the statute would not be tolled. In this case, however, the plaintiff relied on the professional competence and advice of the defendant with respect to the cause and nature of his condition—a condition about which he as a non-medical person could expect to know nothing and about which he had the right to depend on the defendant for advice and for a full disclosure of the facts. The allegations charged the defendant with fraudulent concealment of the plaintiff's cause of action which, if proved, will toll the statute. The implication is that the defendant had actual knowledge of this commission of the tort.

'It is not necessary that facts charged in a bill as constituting fraud should be so characterized. It is enough if the allegations state facts which constitute fraud; * * *.' Shepherd v. Shepherd, 59 Tenn. 275, 281, 12 Heisk. 275 (1873).

We sustain so much of the assignment of error as relates to fraudulent concealment and reverse and remand the case." (Supra, 450 S.W.2d pp. 580, 581)

After the case was remanded to the trial Court, it was tried before the Circuit Judge and a jury, the trial lasting for several days.

At the close of plaintiff's proof the defendant moved for a directed verdict, which was overruled and said motion for directed verdict was renewed at the close of all of the proof and again overruled at that time.

After argument of counsel and charge of the Court, the case was submitted to the jury, but the jury was unable to agree. Upon receiving the report that the jury was unable to agree, the trial Judge then decided to sustain the defendant's motion for a directed verdict, holding, in effect, that there was no evidence of fraudulent concealment which would toll running of the statute of limitations and therefore, the plaintiff's cause of action was barred by the statute of limitations.

In directing a verdict, the trial Judge made the following comments to the jury:

"The basic cause of action, as I told you, was founded on a theory of lack of informed consent, which means that the plaintiff contended that before this operation he did not have sufficient information from which to base his consent. And, specifically, it says he was not informed of the risk of paralysis. Therefore, if he was not informed of the risk of paralysis, and that certainly was a matter for your determination, and for this purpose I would consider that he was not, that he had no idea that he might become paralyzed as a result of the operation. Yet the plaintiff says on the afternoon following the operation he did know he was paralyzed, and certainly over the next six months that fact was brought home to him very forcibly. So he knew that. He then had a cause of action, because he was paralyzed, he had not been told that he might be paralyzed.

Now the distinction that was presented to you on that basis was that he didn't

know the cause of his paralysis, or the extent of it. But I've concluded that that doesn't affect the fact that he had a cause of action for temporary paralysis, if nothing else. He knew that. He may not have known that he had a cause of action for a permanent paralysis. But the difference between a cause of action for temporary paralysis and permanent paralysis is only in a matter of degree. It doesn't affect the fact that he had a cause of action. And the knowledge of that cause of action must have been quite apparent to him—not the law necessarily concerned with it, but the fact of paralysis.

Now, in order to prevent the statute of limitations from running, one must not know of the cause of action itself, and in this particular type of lawsuit it doesn't matter what caused the paralysis, because the cause of action lies in the fact of paralysis, of which he had not been warned. So he had a cause of action for paralysis, and that fact had not been concealed from him. Therefore, I have concluded that, necessarily, the statute of limitations did run on his cause of action for paralysis, and the fact that he didn't know the extent of his paralysis doesn't affect that basic fact. Therefore, I feel that I have no choice but to direct you to find that the cause of action was known to the plaintiff, and that the statute of limitations now does bar his right to a recovery." (Vol. IV, B. Of E. pp. 462, 463, 464)

A verdict for defendant was accordingly directed, the suit dismissed and this appeal resulted.

Plaintiff has filed a single assignment of error as follows:

"The trial court erred in granting a directed verdict for the defendant on the basis that the statute of limitations had expired at the time suit was commenced. The action was erroneous since the plaintiff had produced sufficient evidence to substantiate the allegations in his declaration which alleged fraudulent concealment of his cause of action by the defendant, and the court should have declared a mistrial. The court's ruling is found at pages 28 and 29 of the Technical Record."

Obviously, this assignment of error raises the single question of whether or not there is any evidence in the record from which it could be concluded that the defendant fraudulently concealed from the plaintiff his cause of action so as to toll running of the statute of limitations.

This makes it necessary for us to review the whole evidence, to take the strongest legitimate view of it in favor of plaintiff, to allow all reasonable inferences from it in his favor and to discard all evidence which contravenes his theory of fraudulent concealment.

Certain facts of the case are uncontroverted and these facts may be briefly summarized as follows:

Prior to the surgery, plaintiff was a physical education instructor, about 43 years of age, and was a former athlete.

At some time during the latter part of the year 1964 he began to notice an unusual tingling sensation in his hands and arms during and immediately after periods of exercise and especially after exercise involving the neck.

Because of this tingling sensation, he consulted Doctor Pomeroy in Nashville and Doctor Pomeroy referred him to the defendant, who is a neurosurgeon.

In the latter part of July or early part of August, 1965, plaintiff was examined by the defendant, as a result of which the defendant concluded that plaintiff's trouble was caused by an osteoarthritic spur protruding into the spinal canal somewhere between the fifth and sixth vertebrae.

As a result of this diagnosis, the defendant recommended a laminectomy, which is a very delicate operation involving removal of the posterior or rear portions of the

vertebrae immediately opposite the point where the osteoarthritic spur was protruding so as to allow the spinal cord to shift backward away from the spur and thus decrease the pressure being exerted upon it by the spur.

Plaintiff consented to this surgery and it was performed by Doctor Scheibert on August 11, 1965.

A local anesthetic was used, but during the surgical process, the plaintiff felt a severe sensation, which he described as being similar to an electric shock of high voltage.

When the plaintiff was returned to his hospital room immediately after surgery, his arms, legs, urinary tract and the lower part of his intestinal tract were paralyzed.

At this point, there is some conflict between the evidence offered by plaintiff and that offered by defendant as to how soon after surgery the paralysis occurred, but it is uncontroverted that it did actually occur at some time not more than thirty hours after surgery.

When plaintiff told the defendant of this paralysis, the defendant made an examination of the surgical incision on the back of plaintiff's neck for the purpose of determining if a clot had formed which was causing the paralysis. This examination disclosed that no such clot was present and then the defendant concluded that the paralysis was caused by a swelling of the muscles around the operative site, thus exerting pressure upon the spinal cord.

Defendant informed plaintiff of this diagnosis and told him that when the swelling subsided the bodily functions would return.

The plaintiff, did, in fact, slowly recover from such paralysis to some extent so that at the date of trial he was able to use his arms and to walk, but not able to walk normally, and he suffered a loss of sexual function and chronic impairment of the urinary and lower intestinal tracts.

About a year after surgery plaintiff attempted to resume his duties as a physical education teacher, but due to his physical impairment, he was not able to continue performance of such duties and was compelled to give up this career.

In the early part of the year 1967 plaintiff decided to go to the Mayo Clinic in Rochester, Minnesota, and he went to that Clinic on July 10, 1967.

While at the Mayo Clinic, he was examined by a neurologist, Doctor Frank M. Howard, Jr., who told him, that in his opinion, something happened as a result of the surgical procedure to aggravate his pre-existing symptoms and to induce some new symptoms.

Therefore, plaintiff never again consulted the defendant and this suit was filed on January 15, 1968.

Plaintiff testified that the defendant did not tell him about any of the risks involved in the surgery; told him that he intended to remove the osteoarthritic spur and did not tell him that he intended to remove substantial portions of his vertebrae.

He also testified that his arms, legs and other portions of his body were paralyzed immediately after the surgery and when he told the defendant about this paralysis the defendant mentioned possibility of it being caused by a blood clot or by swelling of the muscles around the operative site; that the defendant probed and examined the operative site and found no clot in it, whereupon defendant told him that the paralysis was caused by swelling of the muscles.

Plaintiff testified that, prior to the surgery, defendant told him he would be able to go back to his work as a physical education instructor at the beginning of the next school term, which was August 28, 1965.

He testified that up until the last time he consulted him, the defendant told him that he would improve with the passage of time.

Plaintiff's testimony to the effect that the defendant did not tell him of the risks in-

volved in the surgery was corroborated by testimony of his wife, Mrs. Joanne Ray.

Mrs. Ray also testified that soon after paralysis occurred, defendant told plaintiff that, in his opinion, it was caused by a swelling of muscles around the operative site and the defendant continued to assure plaintiff that he would improve with the passage of time.

Doctor Howard of Mayo Clinic, summarized his opinion as to the cause of plaintiff's physical impairment in the following testimony:

"A. I was not present at the time of surgery. Certainly some of his symptoms could be related to a cervical spondylolysis, but taking into consideration the history which he gave us we would have to assume that something happened as a result of the surgical procedure to aggravate his pre-existing symptoms and to induce some new symptoms." (Dep. Dr. Howard, p. 29)

This physician also gave the following answers to the following questions:

"Q. Can musculature around the vertebra at the site at which a laminectomy has been performed produce the type of symptoms that Mr. Ray described to you?

A. Not to my knowledge.

Q. Do you know of any medical authority for such a theory?

A. No, I do not." (Dep. Dr. Howard, p. 28)

Doctor Howard further testified as follows:

"Q. Is the history of an immediate onset of paralysis and neurological symptoms and then subsequent partial improvement more compatible with a probable bruising or with a probable cutting of cord fiber?

A. With the bruising." (Dep. Dr. Howard, p. 34)

In answer to a question as to what he told the plaintiff about risks involved in the surgery, the defendant, Doctor Scheibert, testified as follows:

"A. It has always been my custom to apprise the patient of complications that can develop as a result of treatment. The most major complication was presented as being paralyzed total or a lesser degree, with possible involvements as well of bladder, bowel or sexual functions. The 1952 articles of Norfield and Spillane also, with their early experience of one-third better, one-third worse, and one-third the same has been a figure that has stuck in my mind, and this is presented to patients who have this particular problem.

Q. To the best of your knowledge was it presented to this patient and his wife?

A. Yes.

Q. Your deposition has been read here and you stated you couldn't recall specifically what was said.

A. To the best of my knowledge these things were said. I cannot recall my exact wordage." (Vol. 2, B. of E. pp. 265, 266)

Defendant also testified that paralysis did not develop until approximately thirty hours after the surgery and in answer to questions concerning his opinion as to the cause of such paralysis he gave the following answers to the following questions:

"Q. Dr. Scheibert, what was and is your professional opinion as to what was causing these complications?

A. It was my feeling then and still is that swelling of the spinal musculature, or muscles of the neck, was sufficient in the presence of the exposed spinal cord which was unroofed over the back half to allow sufficient compression to embarrass, whether by actual compression of nerve fiber, or by compression of squeezing, so that blood could enter the area *but* sufficient compression, and that is the area in the spinal cord, sufficient compression to alter function.

Q. You made that explanation to him at that time, did you not?

A. Yes, sir, to the best of my knowledge." (Vol. 2, B. of E. pp. 285, 286)

The defendant stated his reasons for his belief that plaintiff's paralysis was caused by swelling of the muscles around the operative site and, on this subject, he testified as follows:

"Q. Dr. Scheibert, in your professional opinion and based on your training and experience in this field could trauma or injury at the surgery produce symptoms as much as 30 hours later if the spinal cord were injured in the surgical process, or would they appear sooner?

A. One would anticipate that injury to a structure as sensitive as the spinal cord would result with immediate symptoms of loss of function. There may be exception to that in that it could be possible that the spinal cord might have changes, delayed changes. But in so sensitive a structure it would almost certainly appear at the time of any injury.

Q. From your own experience or in your research are you aware of any symptoms of this sort, such as he experienced after a 30-hour interval?

A. No, sir." (Vol. 3, B. of E. pp. 338, 339)

From the foregoing evidence it can be readily seen that there is considerable conflict in the evidence as to how soon after surgery the paralysis occurred and also considerable conflict of opinion between the defendant and Doctor Howard as to the cause of such paralysis.

Since this case is predicated upon the theory that a physician committed battery upon his patient by performing surgery without informed or knowledgeable consent, it may be well for us to point out the distinction between cases of this nature and cases predicated upon injury resulting from negligent or unskilled treatment, the latter of which are known as malpractice cases.

In Butler v. Molinski (1955), 198 Tenn. 124, 277 S.W.2d 448, the Supreme Court said:

· "The courts have properly made a distinction between actions for damages for negligent malpractice and unauthorized performance of an operation. Thus in Cady v. Fraser, 1950, 122 Colo. 252, 222 P.2d 422, 424, it is said:

'Negligence in treatment, as alleged in the complaint, and treatment without employment present basically different claims. Hershey v. Peake, 115 Kan. 562, 223 P. 1113, and Rolater v. Strain, 39 Okl. 572, 137 P. 96, 50 L.R.A.,N.S., 880. The one is based on the existence of a contract and authority for service, and the other upon the lack of such contract or authority. The one is based on lack of care or skill in the performance of services contracted for, and the other on wrongful trespass on the person regardless of the skill or care employed. The assertion of one is a denial of the other.'" (Supra, pp. 131, 132, 277 S.W.2d p. 451)

In Hershey v. Peake, supra, the Supreme Court of Kansas generally discussed cases against physicians which are predicated upon the theory of battery as follows:

"Generally speaking, these cases announce and apply the rule: (a) That a person (in possession of his faculties and in such physical health as to be able to be consulted as to his condition and no emergency existing making it impracticable to confer with him) has the right to say whether or not any contemplated surgical operation shall be performed upon him; (b) that a surgical operation performed upon such a person without his consent is wrongful and unlawful and amounts to a trespass upon the person and is assault and battery; (c) that such person may maintain an action against the surgeon for damages, if any have been sustained, because of such wrongful operation; and (d) such an action may be maintained though the surgeon was learned and skill-

ful and exercised due care and skill in all he did." (Supra, 223 P. p. 1114)

The Kansas Court then said:

"The fundamental distinction between assault and battery, on the one hand, and negligence such as would constitute malpractice, on the other, is that the former is intentional and the latter unintentional." (Citing 5 C.J. 625)

In Berkey v. Anderson (1969), 1 Cal. App.3d 790, 82 Cal.Rptr. 67, the California Court of Appeal, Second District, Division Five, further explained the doctrine of battery as being applicable to cases involving surgery performed *without informed or knowledgeable consent*. In that case plaintiff filed suit against certain physicians for malpractice in connection with the performance of a test by myelogram and for having prescribed the myelogram without informed consent of the plaintiff. In that case the California Court said:

"If appellant did not give his informed or knowledgeable consent, the performance of the myelogram would constitute a technical battery (Pedesky v. Bleiberg, 251 Cal.App.2d 119, 59 Cal.Rptr. 294) for which the defendant would be liable for all damages proximately resulting, whether the myelogram was or was not skillfully performed. (Pedesky v. Bleiberg, supra) and whether they could be anticipated or not (Valdez v. Percy, 35 Cal. App.2d 485, 96 P.2d 142)." (Supra, 82 Cal.Rptr. pp. 76, 77)

■ Thus, it will be seen that whenever a physician performs surgery upon a person, not being authorized by consent and not being protected by the exception made in cases of emergency, the physician is liable to such person for consequent injuries, regardless of whether such injuries resulted from negligence or otherwise.

■ The declaration in the instant case contains no allegation of negligence unless it can be said that negligence is averred in the following allegation appearing therein:

"Based upon what the doctors at the Mayo Clinic told him and upon other advice he has since received, the plaintiff avers that there was a partial severance of his spinal cord during the surgery performed by Doctor Scheibert." (Tech. Rec. p. 3)

There is absolutely no evidence in the record to support this allegation and, at the trial, plaintiff did not insist that the defendant partially severed his spinal cord during the surgical procedure. Therefore, this allegation need not be considered on this appeal.

Thus, it appears that the plaintiff's cause of action is predicated solely upon the theory that the defendant committed a battery upon his person, as a direct and proximate result of which he suffered paralysis of certain bodily functions.

Because of the distinction between cases of malpractice and cases of assault and battery Frazor v. Osborne (1966), 57 Tenn. App. 10, 414 S.W.2d 118, is not applicable to the instant case because Frazor was a malpractice suit.

The real thrust of this Court's opinion in that case is to the effect that the negligence of a physician in failing to discover a surgical sponge that was left in the patient's body during surgery, followed by a long period of negligent treatment of a running sore caused by the presence of such sponge, was continuing negligence and, therefore, the statute of limitations did not begin to run until the physician's negligent treatment of the patient ceased.

In the instant case, there is no reliance at all upon the doctrine of negligence and therefore, no reliance on continuance of negligent treatment, the theory being that a battery was committed upon the plaintiff on August 11, 1965, as a result of which injury was then inflicted upon plaintiff.

■ Plaintiff does not insist there was any surgery performed after August 11, 1965, with the exception of some probing of the incision that was done about two days

later for the purpose of ascertaining whether or not a blood clot was causing paralysis. The theory of a continuing battery is not tenable under the uncontroverted facts of this case.

■ We think it is fair to say that there is evidence in the record from which it may be logically inferred that the defendant made a mistake in diagnosing the cause of plaintiff's post-operative paralysis.

But assuming, as we must, that such inference is both logical and correct, there is no evidence that such mistake on the part of the defendant was anything other than an honest one.

In our opinion an honest mistake made by a physician in diagnosing the cause of a patient's infirmity, standing alone, is not evidence of fraudulent concealment.

Our Tennessee cases hold that knowledge on the part of the physician of the fact of a wrong done is an essential element of fraudulent concealment. Clinard v. Pennington (1969), 59 Tenn.App. 128, 438 S.W. 2d 748.

In the Pennington case this Court said:

"The essence of fraudulent concealment is knowledge in the possession of the person committing the fraud. There is no evidence in this record that defendant knew that the sponge was in plaintiff's body and knowingly concealed this information from her." (438 S.W.2d, p. 753)

In Hall v. De Saussure (1956), 41 Tenn. App. 572, 297 S.W.2d 81, this Court quoted from other Tennessee cases as follows:

"'In Whaley v. Catlett, 103 Tenn. 347, 356, 53 S.W. 131, 134, it was said that "Fraudulent concealment of the cause of action will prevent the running of the statute."

'However, the declaration in the present case fails either to aver that concealment of the cause of the illness of plaintiff's wife was fraudulent on the part of the defendant, or that the existence of this cause was known to the defendant. The averment that the failure to disclose the breach of duty was careless and negligent implies a lack of knowledge on the part of the defendant rather than otherwise. Certainly, we would not be justified in assuming fraud in order to prevent the running of the statute of limitations.'

In Albert v. Sherman, 167 Tenn. 133, 136, 67 S.W.2d 140, 141, the statute of limitations was held to have run because:

'The declaration here does allege that the defendant knew or by the exercise of reasonable care should have known, that the root of plaintiff's tooth was left in his gum. Such averment under Bodne v. Austin (, 156, Tenn. 366, 2 S.W.2d 104) (the husband's case), does not make out a fraudulent concealment of a cause of action. It was said in that case: "The averment that the failure to disclose the breach of duty was careless and negligent implies a lack of knowledge on the part of defendant rather than otherwise. Certainly we would not be justified in assuming fraud in order to prevent the running of the statute of limitations." ' " (Supra, 297 S.W.2d p. 87)

■ Hudson v. Shoulders (1932), 164 Tenn. 70, 45 S.W.2d 1072, does not alter the principle that knowledge on the part of a physician of the fact of a wrong done to the patient is an essential element of fraudulent concealment.

In that case, the trial Judge sustained a demurrer invoking the one year statute of limitations to the declaration charging malpractice.

Plaintiff alleged employment of defendants and their negligent use of x-ray, first in May, 1928, and again in August, 1928, and at other later dates, and that following the August treatment he discovered redness and inflammation of the skin; that he called defendants' attention thereto, and that they, *knowing otherwise*, in the exercise of professional skill which plaintiff did

not possess, falsely and fraudulently represented to him that no ill effects or injurious results would follow the apparent burn, and thus concealed from him the truth that he had been injured by their negligence, as he proved to be seriously and permanently, until after the running of the statutory period. (emphasis ours)

The Supreme Court reversed and remanded for further proceedings but in that case it is to be noted that the declaration alleged knowledge on the part of the physicians.

After carefully considering all of the facts and circumstances of the instant case and the law applicable thereto, we agree with the trial Judge that there is no evidence of fraudulent concealment and therefore, the cause of action is barred by the statute of limitations.

The assignment of error is respectfully overruled, the judgment of the trial Court is affirmed and the plaintiff-appellant will pay all of the costs of this appeal.

SHRIVER and TODD, JJ., concur.