

PATRICIA P. ASHE,                           )
                                            )
      Plaintiff/Appellant,                )          Appeal No.
                                            )          01-A-01-9710-CV-00563
v.                                          )
                                            )          Davidson Circuit
RADIATION ONCOLOGY ASSOCIATES               )          No. 95C-58
and STEVEN L. STROUP, M.D.,                 )
                                            )
      Defendants/Appellees.               )


COURT OF APPEALS OF TENNESSEE


APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY


AT NASHVILLE, TENNESSEE


THE HONORABLE HAMILTON V. GAYDEN, JR., JUDGE


DAVID RANDOLPH SMITH
ROBERT BLAKE MENZEL
David Randolph Smith & Associates
Nashville, Tennessee  37203
      ATTORNEYS FOR PLAINTIFF/APPELLANT


THOMAS A. WISEMAN, III
NationsBank Plaza, Suite 1900
414 Union Street
Nashville, Tennessee  37219-1782
      ATTORNEY FOR DEFENDANTS/APPELLEES

WILLIAM B. CAIN, JUDGE

# <u>OPINION</u>

This case was tried before a jury in the Circuit Court in Davidson County on two issues to-wit: (1) informed consent and (2) professional negligence.

On the issue of informed consent the trial court directed a verdict for the defendant at the conclusion of the plaintiff's proof. On the issue of professional negligence a mistrial was declared when the jury was unable to agree on a verdict.

The case is now before this court on the sole issue of informed consent.

Plaintiff Patricia Ashe was diagnosed with breast cancer in 1988. She underwent a double mastectomy and chemotherapy. In July of 1993 chest x-ray and CT scan confirmed the presence of cancer in her left lung. As a result, doctors performed surgery at Baptist Hospital on July 30, 1993 to remove the upper portion of her left lung. She resumed chemotherapy under the care of Dr. Michael Kuzur. Dr. Kuzur was also consulting with the defendant, Dr. Steven L. Stroup regarding the possible need for radiation therapy. At this time the physicians were unable to determine with certainty whether her lung cancer was metastatic from her 1988 breast cancer or was primary lung cancer unrelated to the previous breast cancer. If Mrs. Ashe suffered from primary lung cancer, radiation therapy would significantly increase her chances for survival for five years and beyond.

Radiation therapy involves the use of a photon beam to kill cancer cells. Radiation, however, causes chemical changes to both normal cells and cancer cells. The intent for use of this therapy is to cause only sublethal damage to the normal cells but lethal damage to the cancer cells which are less resistant

to radiation.

On her first visit to Dr. Stroup Mrs. Ashe received a complete explanation of the procedure and went through a "dress rehearsal" of radiation therapy.

Thereafter Mrs. Ashe submitted herself to radiation therapy. In this case Mrs. Ashe sustained radiation injury to her spinal cord resulting in paralysis of her lower extremities.

All expert witnesses agreed that any patient undergoing such radiation therapy is at some risk for spinal cord injury. Plaintiff's expert, Dr. Carlos Perez, testified that this risk at the dosage received by Mrs. Ashe was from one to two percent. Other medical testimony asserted this percentage to be much smaller, but, for the purpose of reviewing the trial court action in directing a verdict for Dr. Stroup we are required to accept the testimony of Dr. Perez.

It is admitted that Dr. Stroup did not inform Patricia Ashe of this risk of spinal cord injury prior to administering radiation therapy.

Plaintiff testified both by pre-trial deposition and at the trial. She was questioned in deposition as to what she would have decided about radiation therapy had she been informed of the possibility of spinal cord injury. At trial she testified again on the same subject. Her testimony at trial differed significantly from her previous testimony by deposition and at the conclusion of the plaintiff's proof the trial court directed a verdict against her on the informed consent issue applying the "rule of cancellation" stated in *Taylor v. Nashville Banner Publishing Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978). Says the trial judge:

> The court however, does grant your motion on the issue of informed consent on the same basis that you made for Dr. Perez. It's the opinion of the court that the plaintiff has irreconcilably and totally contradicted herself in her deposition and in testimony here today. So I will grant the motion on the issue of informed consent.

We are thus called upon in this appeal to answer three pertinent questions:

1. Did the plaintiff's proof offered at trial present a jury question as to whether or not Dr. Stroup obtained "informed consent" of Patricia Ashe under the standards of T.C.A. 29-6-118 before administering radiation therapy.

2. If a jury question is presented as to "informed consent" is the plaintiff's only burden as to causation to establish that the radiation therapy in fact caused the paralysis.

3. If, in addition to radiation-paralysis causation, plaintiff must further prove causation in a consent context, does the "rule of cancellation" justify a directed verdict against her.

I.      Did the plaintiff's proof offered at trial present a jury question as to whether or not Dr. Stroup obtained "informed consent" of Patricia Ashe under the standards of T.C.A. 29-6-118 before administering radiation therapy.

Plaintiff's qualified expert Dr. Carlos Perez testified that the standard of care in procuring informed consent required the disclosure by Dr. Stroup of the small but potentially catastrophic risk of spinal cord injury from radiation therapy. Although his testimony is hotly disputed by expert witnesses offered for the defendant, we are reviewing a directed verdict for the defendant wherein the evidence must be construed most favorably to the plaintiff. *Cecil v. Hardin*, 575 S.W.2d 268 (Tenn. 1978).

In discussing informed consent this court stated in *German v. Nichopolous*, 577 S.W.2d 197, 202 (Tenn. Ct. App. 1978):

> Liability predicated on the doctrine of informed consent is not dependent upon the existence of negligence in the performance of a physical act. Liability is predicated upon negligence of the physician in the failure to reasonably advise the patient regarding the treatment recommended.

This particular language is reiterated by the court of appeals in *Bryant v. Bauguss*, 1996 WL 465539 (Tenn. App. 1996) and in *Blanchard v. Kellum*,

1997 WL 147525 (Tenn. App. 1997). We note that permission to appeal in **Blanchard v. Kellum** was granted by the Supreme Court on September 29, 1997.

The reference in **Nichopolous** to the physician failing to reasonably advise the patient regarding the treatment recommended in terms of "negligence" is inconsistent with **Cardwell v. Bechtol**, 724 S.W.2d 739 (Tenn. 1987). Said the supreme court in **Cardwell**:

> Although this provision is part of the malpractice statute and while determining whether the Defendant failed to obtain informed consent is dependent upon the standard of care of the profession or specialty, if informed consent is not effectively obtained, the defendant's departure from the standard of care is not negligence but battery because "the doctrine of battery [is] applicable to cases involving [treatment] performed *without informed or knowledgeable consent." Ray v. Scheibert,* 484 S.W.2d 63, 71 (Tenn.App.), *cert. denied* (Tenn.1972)(emphasis in original). As observed in *Lanford v. York*, 224 Tenn. 503, 457 S.W.2d 525 (1970), malpractice "'is based on lack of care or skill in the performance of services contracted for, and [battery] on wrongful trespass on the person regardless of the skill employed. The assertion of one is the denial of the other.'" 224 Tenn. at 510-511, 457 S.W.2d at 528 (citation omitted).
>
> [9] We found it necessary to note this because the Plaintiffs alleged and the trial court instructed the jury on "negligent failure to obtain informed consent." T.C.A. § 29-26-118 does not codify or otherwise create such a cause of action. While the determination of the effectiveness of consent cannot be made without expert testimony on the standard of care concerning what information is usually supplied to enable a patient to give informed consent, considering both the seriousness of the treatment and any expression of concern by the patient, failure to give such information is not the type of omission that results in negligence, but rather it negates consent for the treatment. Without consent, the treatment constitutes a battery.
>
> [10] Under the case law, the correct analysis in our opinion is that if the evidence shows that the person had the capacity to consent, then the question becomes whether the consent given was effective because it was based upon adequate information on which to make the decision to submit to treatment; if not, then a battery results, but if so, then the question becomes whether the defendant subsequently did anything negligent in the administration of the treatment for which consent was obtained, proof of which is controlled by T.C.A. § 29-26-115. The trial court's instruction on negligent failure to obtain informed consent

was, therefore, error, but in view of the verdict and our decision in this case, it was harmless error. Rule 36, T.R.A.P.

[11] These theories, battery and malpractice, are not ordinarily inconsistent, and no election of remedies is generally required; if a battery exists, then malpractice may not necessarily be reached, but if no battery can be shown, then the issue clearly emerges as one of malpractice. This distinction between battery and malpractice (as a form of negligence) is consistently recognized in the case law.

*Cardwell v. Bechtol*, 724 S.W.2d 739, 750 (Tenn. 1987).

Thus we come to the line that must be drawn between that which is required by the standard of care to be disclosed to the patient and that which is not so required. This inexact and case-sensitive line was discussed by the supreme court in the recent case of *Shadrick v. Coker*, 963 S.W.2d 726 (Tenn. 1998). Said the court:

[10] This is not to suggest, however, that a health care provider is required to enumerate in detail every aspect of the proposed treatment or procedure or discuss every possible thing that might go wrong in an effort to obtain the patient's informed consent. "In the first place, to do so is humanly impossible. In the second place, if all the gory details of a proposed surgery were graphically explained to every patient and all possible medical maladies that might result were enumerated, we doubt that a lay person would have the stomach to listen to it all; and if the patient did, would probably be in such a fearful state that no rational decision could be made." *Longmire v. Hoey*, 512 S.W.2d 307, 310 (Tenn.App.1974). Accordingly, health care providers are generally not required to disclose risks that are not material, such as those that are extremely unlikely to occur or one that a reasonable patient would not care to know due to its insignificance; risks that are obvious or already known by the patient; risks that are unforeseeable or unknowable; or where the patient's medical condition renders discussion of the risks and benefits of the treatment or procedure impossible or medically inadvisable, such as in an emergency where the patient is unconscious or otherwise incapable of consenting, or where full disclosure would be detrimental to the patient's total care, i.e., the patient is unduly alarmed or apprehensive to start with and additional information would overload the patient and jeopardize his or her physical or emotional well-being.

963 S.W.2d 726, 733 (Tenn.1988).

The court of appeals in *Longmire v. Hoey*, 512 S.W.2d 307 (Tenn. Ct. App. 1974) observed:

> We are cited to cases from other jurisdictions where the failure to advise of a 1% risk has been the basis of a finding of liability. *Bowers v. Talmage* (1963 Fla.App.) 159 So.2d 888, *Canterbury v. Spence and Washington Hospital Center* (1972) 150 U.S.App.D.C. 263, 464 F.2d 772.
>
> [2] We have no particular quarrel with the results reached in other jurisdictions, but we are not of the opinion that proof of any particular percentage figure is determinative of whether or not a plaintiff has made out a *prima facie* case. We are of the opinion that the serious nature of the risk involved is paramount to any percentage figure of occurrence.
>
> Of course, the percentage of risk of occurrence must be considered along with the nature of that which is risked. In the reported cases which have held that failure to advise of a 1% risk or such other low percentage may be a basis for liability, we also find that which was risked was of a devastating nature; such as complete or partial paralyses, blindness or deafness. We readily admit that when such is the nature of the risk reasonable minds might differ on whether or not the patient should have been advised of that risk. There are those who would risk death itself before a lifetime of paralyses or blindness. Others might prefer to suffer a certain amount of pain rather than risk such disastrous results. The occurrence risked may itself be of great magnitude while the percentage of its occurrence may be small.

512 S.W.2d 307, 310 (Tenn. Ct. App. 1974).

Both the *Longmire* court and the supreme court in *Shadrick* refer to the landmark case of ***Canterbury v. Spence & Washington Hospital Center,*** 15 U.S.App.D.C. 263, 464 F.2d 772 (1972). The facts underlying *Canterbury* are parallel to the facts in this case. In discussing the crucial question, the *Canterbury* court says:

> Dr. Spence further testified that even without trauma paralysis can be anticipated "somewhere in the nature of one percent" of the laminectomies performed, a risk he termed "a very slight possibility." He felt that communication of that risk to the patient is not good medical practice because it

> might deter patients from undergoing needed surgery and might produce adverse psychological reactions which would preclude the success of the operation.
>
> . . .
>
> We reverse. The testimony of appellant and his mother that Dr. Spence did not reveal the risk of paralysis from the laminectomy made out a prima facie case of violation of the physician's duty to disclose which Dr. Spence's explanation did not negate as a matter of law.

464 F.2d 772, 778 (1972).

*Longmire* did not deal with catastrophic injury but rather with a ureterovaginal fistula developing in an area not associated with the surgery. When considered in the context of the case at bar the *Longmire* dicta is revealing:

> In the reported cases which have held that failure to advise of a 1% risk or such other low percentage may be a basis of liability, we also find that which was risked was of a devastating nature; such as complete or partial paralysis, . . .

512 S.W.2d 307, 310 (Tenn. Ct. App. 1974).

Against this background we consider T.C.A. 29-26-118 specifically entitled "proving inadequacy of consent." In cases involving informed consent Tennessee has long followed the "battery" rule. *Cardwell v. Bechtol*, 724 S.W.2d 739 (Tenn. 1987); *Ray v. Scheibert*, 484 S.W.2d 63 (Tenn. Ct. App. 1972); *Lanford v. York*, 244 Tenn. 503, 457 S.W.2d 525 (1970).

Before undertaking a medical procedure it is necessary for the doctor to adequately inform the patient as to serious risks and problems that might develop from the procedure. This includes serious risks that are inherent in the procedure itself no matter how carefully this procedure is performed. Under the *Longmire* observations a small risk of chicken pox would be one thing and a small risk of small pox quite something else. We need go no further in the case at bar than hold that the catastrophic nature of paralysis presents a jury question

under the facts of this case when a duly qualified expert witness testifies that the applicable standard of care for informed consent requires the disclosure of the risks.

II.     <u>If a jury question is presented as to "informed consent" is the plaintiff's only burden as to causation to establish that the radiation therapy in fact caused the paralysis</u>.

Plaintiff asserts that in those jurisdictions like Tennessee following the "battery" rule in cases involving informed consent the only causation issue is whether or not the procedure caused the result. Thus in this case did the radiation treatment cause the spinal cord injury resulting in paralysis.

In his brief, the defendant takes the following position:

This case law highlights the confusion that exists in the body of law regarding informed consent in the medical arena and whether--or when--a claim sounds in battery or negligence. Dr. Stroup respectfully submits that a distinction must be made between two potential kinds of informed consent claims:

1. When the physician utterly fails to inform the patient of the nature of the procedure and the significant risks most likely associated with it; and

2. When the physician fails to inform the patient of a remote (even though consequential) risk of the procedure, but otherwise obtains the patient's informed consent.

Otherwise, a no-fault analysis will prevail and allow a patient to recover damages when that patient has been unfortunate enough to experience a very remote risk that occurred in the absence of negligence. If the patient consents to the touching, but a remote yet undisclosed risk is realized, the jury should be allowed to determine whether that patient, or a reasonable patient, would have nonetheless consented <u>even if the remote risk had been disclosed as part of the informed consent discussion</u>.

Otherwise, the fear expressed in <u>Shadrick</u> and others will be realized. Healthcare providers will feel required to disclose risks "that are extremely unlikely to occur . . .; risks that are unforeseeable or unknowable; or where the patient's medical condition renders discussion of the risks and benefits of the treatment and procedure impossible or medically inadvisable, . . ., or where full disclosure would be detrimental to the patient's total care, i.e., the patient is unduly alarmed or apprehensive to start with an additional

information would overload the patient and jeopardize his or her physical or emotional well-being." (Slip Op., at p. 11.) In the present climate of experts-for-hire, any physician would be foolhardy to exercise discretion and avoid so-called "full disclosure" even if the patient's interests may require it.

On July 13, 1998 the Supreme Court released its opinion in *Frances Blanchard v. Arlene Kellum, D.D.S.*, No. 02-S-01-9709-CV-00083. The court therein makes the distinction asserted by the defendant in this case. Says the Supreme court in *Blanchard*:

> The plaintiff has alleged that she did not give Dr. Kellum permission to pull thirty-two teeth during the office visit giving rise to this litigation. The plaintiff contends that her claim on appeal is predicated upon a theory of "a violation of plaintiff's person" or "an actionable battery" and is not "related to medical or professional negligence." She argues that expert testimony should not be required merely to show whether Dr. Kellum procured permission to perform the extractions.
>
> We believe that there is a distinction between: (1) cases in which a doctor performs an unauthorized procedure; and (2) cases in which the procedure is authorized but the patient claims that the doctor failed to inform the patient of any or all the risks inherent in the procedure. Performance of an unauthorized procedure constitutes a *medical battery*. A simple inquiry can be used to determine whether a case constitutes a medical battery: (1) was the patient aware that the doctor was going to perform the procedure (i.e., did the patient know that the dentist was going to perform a root canal on a specified tooth or that the doctor was going to perform surgery on the specified knee?); and, if so (2) did the patient authorize performance of the procedure? A plaintiff's cause of action may be classified as a medical battery only when answers to either of the above questions are in the negative. If, however, answers to the above questions are affirmative and if the plaintiff is alleging that the doctor failed to inform of any or all risks or aspects associated with a procedure, the patient's cause of action rests on an informed consent theory.
>
> . . .
>
> Lack of informed consent in a medical malpractice action under Tenn. Code Ann. § 29-16-118 operates to negate a patient's authorization for a procedure thereby giving rise to a cause of action for battery. <u>Cardwell v. Bechtol</u>, 724 S.W.2d 739, 750-51 (Tenn. 1987). There is,

however, no prior authorization or consent in a medical battery case to be negated by expert testimony. The primary consideration in a medical battery case is simply whether the patient knew of and authorized a procedure. This determination does not require the testimony of an expert witness.

*Frances Blanchard v. Arlene Kellum, D.D.S.*, No. 02-S-01-9709-CV-00083, slip op. at 4-6 (Tenn. July 13, 1998) (emphasis added).

In the case at bar there is no assertion of a "medical battery" case as defined in *Blanchard* since not only was the radiation therapy authorized by the plaintiff but in fact was "dress rehearsed" before the procedure was undertaken. We are dealing here only with lack of informed consent under T.C.A. § 29-16-118 and not with a *Blanchard* defined "medical battery" case. Thus we refer to the rule in *Shadrick*.

The supreme court has stated:

[5] A cause of action based on the lack of informed consent stems from the premise that a competent patient should be allowed to formulate an intelligent, informed decision about surgical or other treatment procedures the patient undertakes. *Housh v. Morris*, 818 S.W.2d 39, 41 (Tenn.App.1991). The basic policy consideration which supports the recognition of the cause of action for lack of informed consent has been explained as follows:

> The root premise is the concept fundamental in American jurisprudence that 'every human being of adult years and sound mind has a right to determine what shall be done with his own body. . . .' True consent to what happens to one's self is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks dependant upon each. The average patient has little or no understanding of the medical arts, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision. from these almost axiomatic considerations springs the need, and in turn the requirement, of a reasonable divulgence by [the] physician to [the] patient to make such a decision possible. *Canterbury v. Spence*, 464 F.2d 772, 780 (D.C.Cir.1972).

[6-8] Accordingly, the law recognizes that a health care provider, such as a physician or surgeon, who proposes a treatment or surgical procedure has a duty to provide the patient with enough information about the nature of the treatment or procedure involved to enable the patient to make an intelligent decision and thereby give an informed consent to the treatment or procedure. *See Cardwell v. Bechtol*, 724 S.W.2d 739, 750 (Tenn.1987).

*Shadrick* at 731.

The position of the plaintiff that there is no causation issue except the cause and effect relationship between the radiation therapy and the spinal injury might well be correct in a Blanchard defined 'medical battery' action. It likewise finds support in Pennsylvania Gouse v. Cassell, 615 At.2d 331 (Penn. 1992) but little support elsewhere. In a lack of informed consent case under T.C.A. § 29-16-118, Tennessee has not so limited the causation inquiry. Nor have Tennessee cases articulated a causation standard directly encompassing the effect of lack of informed consent on the preoperative decision-making of the patient. The only hint comes from *Longmire v. Hoey*, 512 S.W.2d 307, 309 wherein the court of appeals observes: "Although not of itself necessarily controlling, we can not help but note that plaintiff never claimed that she would have made any other choice than the one she made, even if she had been advised of the possibility of a fistula developing." This hints at a subjective causation standard.

Professor Joseph H. King, Jr. in his 1977 article: "The standard of care and informed consent under the Tennessee Medical Malpractice Act" vol. 44 Tenn. Law Review 2 observed:

> Another aspect of the causation requirement deals with the question of whether the required disclosure would have made any difference in the decision to proceed with the treatment. Most courts and legislatures that have addressed the question apply an objective standard, which requires that plaintiff prove that a reasonable person in plaintiff's position would have declined the therapy had he been adequately informed. A few courts have adopted a subjective standard that would inquire whether the particular plaintiff would have consented had the appropriate disclosure been made.

44 Tenn. Law Review 2 at p. 295. Footnotes omitted.

Recognizing the reliance of *Longmire* and *Shadrick* on preeminent authority of the near encyclopedic decision in *Canterbury v. Spence*, 464 F.2d 772 (1972); and lacking further guidance from the appellate courts in Tennessee, we adopt the objective causation standard stated therein:

[31] A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it. The patient obviously has no complaint if he would have submitted to the therapy notwithstanding awareness that the risk was one of its perils. On the other hand, the very purpose of the disclosure rule is to protect the patient against consequences which, if known, he would have avoided by foregoing the treatment. The more difficult question is whether the factual issue on causality calls for an objective or a subjective determination.

It has been assumed that the issue is to be resolved according to whether the factfinder believes the patient's testimony that he would not have agreed to the treatment if he had known of the danger which later ripened into injury. We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory. To be sure, the objective of risk-disclosure is preservation of the patient's interest in intelligent self-choice on proposed treatment, a matter the patient is free to decide for any reason that appeals to him. When, prior to commencement of therapy, the patient is sufficiently informed on risks and he exercises his choice, it may truly be said that he did exactly what he wanted to do. But when causality is explored at a post-injury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: "Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?" And the answer which the patient supplies hardly represents more than a guess, perhaps tinged by the circumstance that the uncommunicated hazard has in fact materialized.

In our view, this method of dealing with the issue on causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.

[32] Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance. If

-13-

adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. The patient's testimony is relevant on that score of course but it would not threaten to dominate the findings. And since that testimony would probably be appraised congruently with the factfinder's belief in its reasonableness, the case for a wholly objective standard for passing on causation is strengthened. Such a standard would in any event ease the fact-finding process and better assure the truth as its product.

*Canterbury v. Spence*, 464 F.2d at 790-791 (1972).

III.      <u>If in addition to radiation-paralysis causation plaintiff must further prove causation in a consent context, does the "rule of cancellation" justify a directed verdict against her</u>.

Since the objective standard we adopt renders the testimony of the plaintiff but one of the factors to be considered, the "rule of cancellation" of *Taylor* does not apply. Since this rule formed the sole basis for the trial court's directed verdict, the action of the trial court in this respect is reversed.

The discrepancies between the testimony of Mrs. Ashe at her deposition and her testimony at trial go to her credibility as a witness and must be considered along with all other evidence presented to the trier of fact on the causation issue under an objective person standard.

Appellee asserts error in the failure of the trial court to grant its motion for a directed verdict on the issue of professional negligence in this case. The jury was unable to reach a decision and a mistrial was declared as to this issue.

The order granting the motion of the defendant for a directed verdict on the informed consent issue provides:

> After considering the argument of counsel, the pleadings submitted by the parties, and otherwise being sufficiently advised, the court denies the plaintiff's motion for new trial and motion for partial summary judgment, and grants the defendant's motion to make the directed verdict final. Accordingly, it is hereby ordered that the plaintiff's informed

consent claim is dismissed with prejudice. All other claims by the plaintiff are reserved and the case is hereby stayed pending the plaintiff's expected appeal of the directed verdict.

This order as to the directed verdict on the informed consent claim is final and there is no just cause for delay.

The only notice of appeal is that filed by the plaintiff which is pursuant to rule 54.02 of the Tennessee Rules of Civil Procedure and effectively brings before this court only the informed consent issue.

The action of the trial court in directing a verdict in favor of the defendants on the issue of informed consent is reversed and the case is remanded for a new trial along with the negligence issue still pending in the trial court.

Costs of this appeal are assessed to the appellees.

_____
CONCUR:                                    WILLIAM B. CAIN, JUDGE

_____
HENRY F. TODD, PRESIDING JUDGE

_____
BEN H. CANTRELL, JUDGE